A89A2006. DOCTORS HOSPITAL OF AUGUSTA, INC.
v. BONNER et al.
A89A2007. ANESTHESIA GROUP v. BONNER.
(392 SE2d 897)

BEASLEY, Judge.
Anesthesia Group and Doctors Hospital of Augusta, Inc., d/b/a Humana Hospital, appeal the judgments entered on jury verdicts against each of them in this medical malpractice case brought by the representative and family of Ada Hammonds Pierce.

The evidence at trial is construed so as to uphold the verdict. *Pendley v. Pendley*, 251 Ga. 30, 31 (1) (302 SE2d 554) (1983). Ms. Hammonds, the name she used professionally, was a 38-year-old Licensed Practical Nurse who worked in the delivery room at St. Joseph's Hospital. She slipped in the delivery room and injured her knee, requiring arthroscopic surgery. She was admitted by orthope-

dist Dr. Brand to Humana Hospital on October 4, 1983.

Humana Hospital had contracted in 1981 with Anesthesia Group, a partnership composed of Dr. Horseman and Dr. Mahoney, for the partnership to "provide full-time Anesthesiology services and assume general responsibility for the conduct and operation of Hospital's Anesthesiology Department, subject to approval of Hospital." The contract provided that services under it would be performed as scheduled by the Hospital Administration and that Group was required to provide an anesthesiologist from 7:00 a.m. to 3:30 p.m. Monday through Friday and otherwise as required by the Hospital. The partnership had to be available on 30 minutes notice for emergencies. The emergency services could be provided by a Certified Registered Nurse Anesthetist (CRNA) with an anesthesiologist available for supervision. The two partners were members of the hospital staff.

Surgery was scheduled by Hospital based on the requests for surgery made by surgeons such as Dr. Brand. A surgery schedule was prepared around 1:00 p.m. each day, typed up by Hospital's Director of Surgery and given to Group, which would decide how to staff the needed anesthesia services. Group set a fee schedule under the contract, which was subject to approval of Hospital. Hospital did not have approval rights of fees set by other doctors. When surgery was completed, the doctor or CRNA gave a charge slip, with the patient and surgery information and anesthesia charge on it, to Hospital's administrative staffer in the operating suite. The anesthesia was billed on the hospital bill. The notation on Ms. Hammonds' bill was "Anesthesia supplies 90.88 Anesthesia hosp empe 286.00." Hospital paid Group 86 percent of the total anesthesia charges, retaining 5 percent as administrative costs and 9 percent to cover "bad debts." There was a charge back provision in the contract: if any third party provider did not pay or paid only partially, Group would reimburse Hospital. Hospital owned the accounts. Bill disputes with patients and collection were its responsibility.

Group in turn had contracted with five Certified Registered Nurse Anesthetists who worked under the partnership at Hospital. One of these CRNAs, Sarafin, visited Ms. Hammonds the evening of her admission. He introduced himself to all patients as being from the "anesthesia department." Nurses, including CRNAs, were required to wear uniforms of certain colors denoting their position. They were also provided name tags with their and the Hospital's names on it. Sarafin did the preoperative workup on Ms. Hammonds and prescribed preoperative medication. He signed Dr. Horseman's name to the orders. Dr. Horseman did not see Ms. Hammonds, nor did Sarafin consult with him concerning her.

On October 5, after having been given morphine at 6:00 a.m. for the surgery, Ms. Hammonds was taken to the pre-op holding area.

She was visited by CRNA Jimenez, who was scheduled to administer anesthesia. He introduced himself to patients as a CRNA or nurse anesthetist with the "anesthesia service."

Dr. Mahoney was the floating anesthesiologist that day. He reviewed Ms. Hammonds' records in the pre-op holding area, approved the pre-op medications after they had been given, discussed for a minute or two the anesthesia plan with Jimenez, and spoke briefly with the patient.

Dr. Mahoney was not present in the operating room when anesthesia was induced nor during the surgery. Ms. Hammonds was put to sleep and then given a 100 mg. dose of Anectine at 7:05 a.m. Anectine paralyzes a patient so that the vocal cords will remain open, allowing insertion of an endotracheal tube to aid breathing during surgery. The surgery, uneventful, was completed at 7:46 a.m.

At 7:48 a.m., the endotracheal tube was suctioned out and removed. Ms. Hammonds was suctioned again and preparations were being made to roll her onto a gurney when a laryngospasm, which interferes with breathing, was observed by Jimenez. He administered 20 mg. of Anectine at 7:51 a.m. to break the spasm. It broke for approximately three breaths but reoccurred. Dr. Brand, the surgeon, had noticed Ms. Hammonds' toes and toenails becoming cyanotic, or turning blue, about five minutes after the surgery ended. He told Jimenez, who responded that he was administering medicine.

A second 20 mg. dose of Anectine was given at 7:56 a.m. but had no effect on the ability of Jimenez to ventilate the patient. At 8:00 a.m., circulating nurse Duffy left the operating room, went to the desk in the operating suite, and told the nurse there to find Dr. Mahoney. She got the code cart and returned to the operating room. Dr. Mahoney arrived and began to assist Jimenez. At 8:02 a.m., Jimenez gave a 100 mg. dose of Anectine, reintubated the patient, and started an i.v. drip of Anectine.

Jimenez saw no improvement in his ability to ventilate Ms. Hammonds. Both he and Dr. Mahoney listened to her chest, but her weight (250 pounds, height 5 feet) made chest sounds less clear. Both believed she had developed a bronchospasm, which causes the small sacs in the lungs to constrict, in addition to the laryngospasm. Bronchospasm under these circumstances is extremely rare and is seldom fatal.

During this period, Ms. Hammonds' heart rate became very slow, including at least two incidents of asystole or stoppage. Cardiac massage was used at intervals. Medications, effective both to stimulate the heart and to relax bronchospasm, were administered. At 8:07 a.m., due to the continuing difficulty, Dr. Mahoney decided to remove the second endotracheal tube and replace it with another. At 8:10 a.m., improvements in respiration began as it finally brought air to the

lungs and ultimately to the brain.

Upon arrival at the intensive care unit, the nurses noted that the abdomen was "distended and tympanic sounding." This can be caused by pumping air into the stomach from an improperly placed endotracheal tube. Ms. Hammonds never regained consciousness and remained on a respirator until she was declared brain dead and life support was removed on October 11.

### Case No. A89A2007

1. Group's first two enumerations allege error in the trial court's denial of their motion for directed verdict on the issue of negligence *per se* based on violation of OCGA § 43-26-9 (b) and the court's charge on it.

That section provides that anesthesia may lawfully be administered by a CRNA "provided that such anesthesia is administered under *the direction and responsibility of a duly licensed physician with training or experience in anesthesia.*" (Emphasis supplied.)

The allegations against Group and Hospital were that there had been a failure to exercise the degree of care generally required in the administration of anesthesia. See OCGA § 51-1-27. It was further alleged that Dr. Mahoney and CRNA Jimenez were agents and employees of Hospital.

The contracts entered into between Group and its CRNAs described the arrangement as one not between employer and employee, but between a "contractor," Group, and "subcontractors," the CRNAs. They further stated that the arrangement was meant to make the CRNAs "independent contractors."

" 'By statute, the physician is the only one empowered to practice medicine.' [Cit.] OCGA § 43-26-9 makes an exception in the specialty of anesthesiology and allows a nurse who meets the qualifications of the statute to administer anesthesia under particular supervision." *Central Anesthesia Assoc. v. Worthy*, 173 Ga. App. 150, 152 (325 SE2d 819) (1984), affirmed 254 Ga. 728 (1985).

Dr. Horseman, while acknowledging that he did not understand the meanings of the terms "employee and independent contractor," believed the contract did not diminish his ability to control the CRNAs and to direct their activities in the administration of anesthesia. Nonetheless, he had given no instructions to the CRNAs as to when they should call an anesthesiologist to the operating room. He believed the understanding of the CRNAs was that they should call when they needed the doctor for "consultation."

Dr. Mahoney stated he was unaware of any written guidelines which delineated when the CRNA should request assistance from the anesthesiologist, and he mentioned no verbal guidelines.

Jimenez said he was an independent practitioner but elected to work in a hospital "where I work with anesthesiologists so that I have their expertise to use along with my own." He described the anesthesiologist as "a consulting person and a resource person and an assistant who has a little more medical background or a lot more medical background than I do."

The anesthesia guidelines for the Hospital state that "[t]he anesthetist responsible for the anesthesia decisions required during anesthesia management be already identified [before induction] to the patient and to any technician who may assist in such care and management, and *his availability for supervision and direction be established if he is not administering the anesthesia personally.*" (Emphasis supplied.)

Two anesthesiologists testified as experts. Dr. Jeffries, for Hammonds, opined that Jimenez' actions were deficient in several respects and that the degree of supervision and direction exercised by Dr. Mahoney was not commensurate with that required in the practice of anesthesiology at that time. In his opinion, the CRNA should immediately initiate treatment and call the doctor as soon as any respiratory problems arise. Instead, Jimenez continued to try to correct the problem himself and the doctor was finally summoned by the circulating nurse. Dr. Jeffries believed that Ms. Hammonds' size made a 20 mg. dose of Anectine useless and that the 100 mg. dose should have been given initially. It was also his opinion that Jimenez' intubation at 8:02 a.m. was into the esophagus, not the trachea, taking air to the stomach and not to the lungs, which would have resulted in distention of her abdomen if allowed to continue for five minutes or more. It would not have provided needed oxygen to the brain.

Dr. Jeffries said that such intubations can occur but felt that failure to recognize that the tube was in the wrong place and failure to correct it for over five minutes caused the damage resulting in her death.

Dr. Bartel, defendants' expert, initially said that calling Dr. Mahoney after the second laryngospasm was appropriate, but added that the anesthesiologist should be called immediately when cyanosis is present. She also agreed that the 20 mg. dose was insufficient for a woman of Ms. Hammonds' size and that the second dose should have been a full 100 or 120 mg. in order to break the spasm.

Appellant Group argues that there was no evidence that the statute had been violated, rendering the charge and denial of their motion for directed verdict error.

*Central Anesthesia Assoc. v. Worthy,* supra, holds that OCGA § 43-26-9 establishes the standard of conduct constituting ordinary care for use of CRNAs and that its violation can amount to negligence *per se.* See *West v. Mache of Cochran,* 187 Ga. App. 365, 367 (1) (370

SE2d 169) (1988). *Worthy* found that the administration of anesthesia by a registered professional nurse, in her second year of training to become a CRNA, under the supervision of a physician's assistant without the involvement in any way of the anesthesiologist, who was on a different floor when complications arose, was sufficient for the granting of summary judgment to the plaintiffs.

It also held that "[t]he purpose of OCGA § 43-26-9 is to protect patients from the dangers of improperly administered anesthesia by those unqualified by a lack of what public policy regards as minimum education in the field, and by a lack of specified supervision. . . . The statute set[s] threshold qualifications which [have] to be met before a person would be permitted under the law to apply anesthesia. These qualifications do not establish how the anesthesia is to be administered, or what methods or instruments may be used, but rather who may do it with whose supervision. Thus it prohibits anyone not meeting these qualifications from performing, and *it further prohibits even a statutorily qualified person from performing without prescribed supervision.*" Id. at 153. (Emphasis supplied.) Thus, the "direction" referred to in the statute has been equated with "supervision." See Webster's Third Intl. Dictionary 640, 2296 (1981).

As to Ms. Hammonds, there was sufficient evidence from which a jury could conclude that, because there was no clear understanding between the doctors and the CRNAs, and in particular Dr. Mahoney and Mr. Jimenez, as to when the doctor should be summoned whenever difficulties were encountered, this was a failure of the mandated degree of "direction and responsibility." Time itself was crucial here. Delay resulted in inadequate treatment of the laryngospasm for over five minutes before Dr. Mahoney was summoned.

Group's motion for directed verdict contended that the only failure of care was the esophageal intubation, done in the presence of Dr. Mahoney, and thus as a matter of law under his "direction and responsibility." Pretermitting the issue of whether his walking in the door during the reintubation was sufficient supervision, *Ross v. Chatham County Hosp. Auth.*, 258 Ga. 234 (367 SE2d 793) (1988), the plaintiffs' theories were broader than this. They included the lack of understanding between doctor and CRNA as to when the doctor should be called and the failure to have the doctor available sooner.

Denial of the directed verdict was not error. OCGA § 9-11-50 (a). *Marriott Corp. v. American Academy of Psychotherapists*, 157 Ga. App. 497, 498 (1) (277 SE2d 785) (1981). *Horney v. Lawrence*, 189 Ga. App. 376, 377 (2) (375 SE2d 629) (1988).

The fact that the level of supervision is not more definitive in the statute is not dispositive and did not require a directed verdict. It is a standard which is subject to elucidation by experts as is any other professional standard. *Loving v. Nash*, 182 Ga. App. 253, 255 (1) (355

SE2d 448) (1987); see *Sparks v. Hoff*, 186 Ga. App. 907, 908 (368 SE2d 830). Such expert opinion was provided and resolution of the differences in the experts' opinions was for the jury. Id. The charge tracked the language of the statute and, in the absence of any particularized request to charge by Group, no further explication was required. The court's charge was sufficient. *Schroeder v. Hunter Douglas, Inc.*, 172 Ga. App. 897, 901 (7) (324 SE2d 746) (1984); *Parrott v. Edwards*, 113 Ga. App. 422, 429 (5) (148 SE2d 175) (1966).

2. Enumeration three alleges error in the following charge on admissions: "[I]t is contended that there have been admissions in this case, and I charge you that an admission is a statement or writing by a party which tends to aid the cause of the other party. And all admissions under our law are to be carefully considered. In this case . . . the plaintiff has contended that certain statements in the medical charts constitute admissions, and these admissions, if they appear to be such, should be carefully considered as a statement tending to aid the cause of the side."

Group's objection was that the court charged admissions, then "went on to emphasize that more by stating that if plaintiffs had contended the statements in medical charts were admissions on behalf of Anesthesia Group. I would particularly object to that because there is no evidence and there are no writings in the chart anywhere by Anesthesia Group, an entity. There was never any evidence before the court that any individual was authorized to make any admissions. There was no party Anesthesia Group that made any admissions. And the court's charge on that, therefore, was prejudicial. Was not adjusted to the facts and not a part of the case."

Other objections argued for the first time on appeal will not be considered. OCGA § 5-5-24; *AAA Van Svcs. v. Willis*, 180 Ga. App. 18, 19 (3) (348 SE2d 475) (1986); *Eiberger v. West*, 165 Ga. App. 559, 560 (2) (301 SE2d 914) (1983).

As reflected above, there was evidence from which the jury could conclude that Jimenez was the employee of the partnership, not an independent contractor. Although Dr. Horseman and Dr. Mahoney said they were professional corporations, Dr. Mahoney signed the agreement with Jimenez as an individual and both doctors signed the contract with Hospital as individuals.

An admission made by a partner concerning partnership affairs within the scope of his authority is evidence against the partnership. OCGA § 14-8-11 (enacted by Ga. L. 1984, p. 1439, prior to which general scope of partners' authority would cover principle involved, former OCGA § 14-8-61). An admission by an employee of the partnership within the scope of his authority can be considered against the partnership. OCGA § 24-3-33.

The charge given is set out in Vol. I, Civil Cases, Suggested Pat-

tern Jury Instructions, 2d ed., p. 19. Whether Jimenez was the agent of the partnership, whether the partnership was the agent of Hospital, and whether there were any admissions in the medical records were for the jury to determine pursuant to the instruction. The charge as given may have been beneficial to the Group in that it limited the consideration of admissions to the medical records when there were arguably admissions made in the testimony of Drs. Horseman, Mahoney, and CRNA Jimenez outside these records. The enumeration evaporates.

3. Error is alleged in the admission of Plaintiff's Exhibits 64 and 65, handwritten consultations made by Drs. Bashinski and Smith on the morning of the incident.

Early in the trial, the entire medical chart of Ms. Hammonds was tendered into evidence by plaintiffs. The only objection was that parts of it, P-64 and P-65, were hearsay and inadmissible without proper foundation. The objection was sustained as to these two documents.

Thereafter, Dr. Jeffries testified and stated his conclusion that Ms. Hammonds had suffered cardiac arrest as a result of lack of oxygen, causing brain damage. He was asked on direct examination not to consider P-64 and P-65 and based his opinion on the remainder of the medical record. Dr. Jeffries was vigorously cross-examined by Group as to the lack of any notation of "cardiac arrest" as the precipitating factor anywhere in the medical chart. Defendants contended that she had suffered a respiratory arrest, with subsequent brain damage, as a result of the laryngospasm and bronchospasm which were appropriately treated without her responding.

On redirect, plaintiffs again tendered the two consults, which did mention cardiac arrest, arguing that the hearsay objection had been waived by the repeated questioning concerning the absence of such a notation in the reports of those present with Ms. Hammonds on October 5. The court admitted them.

Thereafter, Dr. Bartel, Group's expert witness, testified and acknowledged that she had considered and relied upon both P-64 and P-65 in reaching her conclusions.

The two documents were hearsay, OCGA § 24-3-1. A physician may not base his expert opinion solely on the hearsay opinion of another doctor, thereby acting as a mere conduit for the opinion of the first. *Mallard v. Colonial Life &c. Ins. Co.*, 173 Ga. App. 276 (326 SE2d 6) (1985); *Stephen W. Brown &c. Assoc. v. Gowers*, 157 Ga. App. 770, 780 (5) (278 SE2d 653) (1981). Nor may he base such an opinion on reports or facts which are not in the record. OCGA § 24-9-67; *Andrews v. Major*, 180 Ga. App. 393, 395 (2) (349 SE2d 225) (1986). That, however, did not occur. Dr. Jeffries, as well as Dr. Bartel, examined portions of Ms. Hammonds' medical chart, including

the objective findings noted by numerous medical personnel and equipment, such as the EKG machine attached to her throughout the surgery. Their opinions were based on these facts.

Even if Dr. Jeffries had partially found his opinion on inadmissible hearsay as well as facts, such would go to the weight rather than to the admissibility of the opinion. *King v. Browning*, 246 Ga. 46, 47 (1) (268 SE2d 653) (1980).

P-64 and P-65 were admitted not for the purpose of proving that the diagnosis contained in them was the correct one, but to counter the incorrect impression made on the cross-examination of Dr. Jeffries that the notation "cardiac arrest" appeared nowhere in the medical chart. Having opened the door, Group cannot complain that plaintiffs entered. *Tiftarea Shopper v. Maddox*, 187 Ga. App. 227 (2) (369 SE2d 545) (1988).

Numerous other witnesses who were present at the surgery, including Jimenez, acknowledge that "asystole," or moments of heart stoppage, occurred during the treatment. Cardiac arrest is "asystole." Dorland's Pocket Med. Dictionary, p. 79 (23rd ed. 1982). Any error in the allowance of these exhibits would have been harmless. *Andrews*, supra at 395.

4. Orthopedist Dr. Brand's testimony was by deposition. During its reading, Group objected that an answer was non-responsive and hearsay. The answer was to plaintiffs' question whether any reasons for the third intubation (by Dr. Mahoney) were discussed in the operating room. Dr. Brand answered that "It's my understanding from an anesthesiologist when a patient isn't doing well, the first thing you should think about is, is the tube in the right place or not. You ought to be sure that it is in the right place."

The answer was not responsive to the question. But knowledge gained by an expert during the practice of his profession, even from hearsay, may be used to express an opinion. *King*, supra; *Brown v. State*, 245 Ga. 588, 590 (1) (266 SE2d 198) (1980). Although Dr. Brand was not an anesthesiologist, he was a surgeon and stated that, as such, he had training in and an understanding of anesthesia. The fact that the tube should be checked was testified to by Dr. Jeffries, so the admission of Dr. Brand's statement, even if error, was harmless. *Atlanta Gas Light v. Redding*, 189 Ga. App. 190 (1) (375 SE2d 142) (1988).

5. Finally, Group complains of the court's failure to give its seventh Request: "I charge you that the law does not require that medical treatment to a patient shall yield perfect or nearly perfect results."

"In order for a refusal to charge to be error, the requests must be entirely correct and accurate, and adjusted to the pleadings, law, and evidence, and not otherwise covered in the general charge. [Cit.]" *Me-*

*doc Corp. v. Keel,* 166 Ga. App. 615, 618 (2) (305 SE2d 134) (1983); see *Woodcraft Div. v. Laborers' Intl. Union &c.,* 170 Ga. App. 581, 585 (317 SE2d 602) (1984). "The mere fact that a requested charge was taken from an opinion of our appellate courts does not render its use appropriate in charging the jury. [Cits.]" *Kamor v. Fireman's Fund Ins. Co.,* 133 Ga. App. 234, 238 (5) (211 SE2d 179) (1974); *Citizens Bank &c. v. Hooks,* 173 Ga. App. 865, 867 (3) (328 SE2d 755) (1985).

The principles applicable to a finding of medical malpractice were thoroughly given, including that "the mere fact that there is an unfortunate or bad result occurred does not alone prove and does not imply that any of the defendants were negligent or unskillful." This served the purpose of the requested charge.

### Case No. A89A2006

6. Hospital's first two enumerations allege errors in the court's denial of its motions for summary judgment and directed verdict. To the extent they address the denied summary judgment motion, the issue is moot. *Hardaway Constructors v. Browning,* 176 Ga. App. 530 (2) (336 SE2d 579) (1985).

(a) The first basis urged in the motion for directed verdict relied on principles in *Overstreet v. Drs. Hosp.,* 142 Ga. App. 895 (237 SE2d 213) (1977) and *Pogue v. Hosp. Auth. of DeKalb County,* 120 Ga. App. 230 (170 SE2d 53) (1969). Hospital contended that the contract between Hospital and Group showed that neither Dr. Mahoney nor Jimenez were employees or agents of Hospital but instead were individual contractors for whose actions Hospital was not liable.

*Pogue* has been often cited and much discussed for the proposition that "[a] hospital is not liable for the negligence of a physician employed by it where the negligence relates to a matter of professional judgment on the part of the physician when the hospital does not exercise and has no right to exercise control in the diagnosis or treatment of illness or injury."

*Brown v. Coastal Emergency Svcs.,* 181 Ga. App. 893, 895 (2) (354 SE2d 632) (1987), aff'd sub nom. *Richmond County Hosp. Auth. v. Brown,* 257 Ga. 507 (361 SE2d 164) (1987) states: "[s]ince it would almost certainly be violative of a physician's professional ethics for him to abandon his professional judgment in matters relating to the diagnosis and treatment of patients, it has been pointed out that literal application of this test would effectively enshroud hospitals with an 'impenetrable cloak of immunity' in malpractice actions based on physician negligence. See *Stewart v. Midani,* 525 FSupp. 843, 849 (N. D. Ga. 1981) [for analysis of Georgia cases]. Cf. *Mitchell County Hosp. Auth. v. Joiner,* 229 Ga. 140 (189 SE2d 412) (1972). However, it

is quite evident that the control test set forth in *Pogue* has not been applied to such effect by the courts of this state."

Cases including *Newton County Hosp. v. Nickolson*, 132 Ga. App. 164, 167 (207 SE2d 659) (1974), and *Hodges v. Drs. Hosp.*, 141 Ga. App. 649 (234 SE2d 116) (1977) have held hospitals liable for physicians' malpractice when the evidence indicated control by the hospital only of the time and place and not necessarily the manner of the exercise of their professional judgment. Compare *Bexley v. Southwire Co.*, 168 Ga. App. 431, 432 (1) (309 SE2d 379) (1983), aff'd 253 Ga. 125 (317 SE2d 523) (1984).

We need not resolve this quandary. There was adequate evidence from which the jury could conclude that Hospital had retained authority over the time, method and manner of the practice of anesthesiology at its facility, and that its employee, Group, through its partner Dr. Mahoney, was negligent in failing to properly supervise CRNA Jimenez and in failing to properly preintubate Ms. Hammonds immediately upon his arrival in the operating room.

Hospital relies heavily on paragraph VII of its contract with Group. It is labeled "Independent contractor" and states that "[t]he Partnership and the Hospital acknowledge that any person designated by the Partnership and performing anestheology [sic] or anesthetist services hereunder are not employees, agents, partners or joint venturers with the Hospital." Such labeling in a contract is not determinative of the status of any such person and other factors may negate the label. *McGuire v. Ford Motor Credit Co.*, 162 Ga. App. 312, 313 (290 SE2d 487) (1982); *Frey v. Pepsico*, 191 Ga. App. 585, 587 (1) (382 SE2d 648) (1989).

Contrasted is the following evidence of control, in addition to facts set out earlier. Group was required to treat all patients at Hospital who required such services; it could not choose. It was required to do so in the four operating rooms for stated hours five days a week, for emergencies, 24 hours a day. Hospital had the right to approve the rates charged through its billing system and in its name. Hospital had a closed anesthesiology panel, in that no other anesthesiologists were allowed to practice there. Even Hospital, which contended the panel was open, agreed that any other anesthesiologist desiring to practice would have to be sponsored by either Dr. Horseman or Dr. Mahoney and approved by Hospital beforehand.

Hospital retained the right to approve the anesthesiology services and the conduct and operation of the anesthesiology department. The fact that Hospital may not have exercised this right to its fullest extent or in each particular case does not weaken its significance. *Miller v. Kimball*, 163 Ga. App. 435, 437 (294 SE2d 681) (1982); *Moon v. Ga. Power*, 127 Ga. App. 524, 526 (1) (194 SE2d 348) (1972). Most telling is the contract provision that "[t]o the extent required by the laws

and regulations governing the operation of Hospital, Hospital retains professional and administrative responsibility for the services provided hereunder."

The issue of actual agency was appropriately left to the jury. *Macon-Bibb County Hosp. Auth. v. Whipple*, 182 Ga. App. 195, 196 (2) (355 SE2d 83) (1987); *Lawson Prods. v. Rousey*, 132 Ga. App. 726, 728 (1) (209 SE2d 125) (1974). Since the jury could find that Group and its partner Dr. Mahoney were in fact employees rather than liability-precluding independent contractors, Hospital would be liable for Jimenez' negligent acts because it approved Group's hiring and retention of him. *White v. Morris*, 114 Ga. App. 618, 619 (152 SE2d 417) (1966).

(b) Hospital moved on two grounds for directed verdict on the issue of apparent or ostensible authority of Hospital for the acts of Dr. Mahoney and CRNA Jimenez: there was insufficient evidence of reliance by Ms. Hammonds; the doctrine applies only to emergency room physicians.

Georgia adopted the doctrine of apparent agency medical malpractice actions in *Brown*, supra. It requires that "one . . . represents that another is one's agent so that plaintiff justifiably relies on the care or skill of the apparent agent whose negligence causes the injury. It is not enough that plaintiff simply believes there is an agency relationship. There is an objective standard. The apparent principal must represent or hold out the apparent agent." *Richmond*, supra at 508, 509; *Whitaker v. Zirkle*, 188 Ga. App. 706, 709 (2) (374 SE2d 106) (1988).

The narrow application of the theory only to emergency rooms was rejected in *Whitaker*, supra, which applied it to in-hospital radiology services. The rationale extends to anesthesiology in other states. *Paintsville Hosp. Co. v. Rose*, 683 SW2d 255, 257 (Sup. Ct. Ky. 1985), is illustrative: anesthesiologists, pathologists, radiologists, and emergency room physicians "all . . . share the common characteristic of being supplied through the hospital rather than being selected by the patient."

There was objective evidence that the anesthesiologist and CRNA were acting for Hospital. When Ms. Hammonds was admitted by her private physician, Dr. Brand, she was presented with an admission form headed "Doctors Hospital of Augusta, Inc." It stated she understood "the price of the room does not include the cost of laboratory, x-ray, drugs, dressings, operating room, anesthesia and other special treatments required for treatment."

The Request for Operation form, requiring the signature of each patient upon admission, was headed "Humana Hospital Augusta" and stated, "I request the administration of anesthesia and the use of such anesthetic agents as may be deemed necessary and advisa-

ble. . . ."

Ms. Hammonds was not seen by an anesthesiologist until she had been prepared for her operation, given morphine, placed on a stretcher, and taken to the preoperative area. She had been seen only by a CRNA, the choice of whom had not been given to her. Because she herself was a Licensed Practical Nurse and was in training to become a Registered Nurse, the jury could have found she was aware that a nurse does not practice independently and must be overseen by a physician provided by the hospital, since she had been given no input into selection of personnel. As stated in *Richmond County*, supra at 509: "[m]ost modern hospitals hold themselves out to the public as providing many health related services including services of physicians. A patient is likely to look to the hospital, not just to a particular doctor he comes into contact with through the hospital."

As to reliance by Ms. Hammonds on Humana, there was no direct evidence of affirmative statements made by her but such reliance is subject to proof by circumstantial evidence. OCGA §§ 24-1-1 (4) & 24-4-9. It was adequate for an inference of reliance. Denial of the directed verdict on this ground was not error.

7. Hospital's third enumeration urges error in denial of the motion for directed verdict on the ground that the Hospital cannot be liable for acts involving professional judgment of Jimenez. It is presented here also as to Dr. Mahoney, but that was not part of the motion made at trial and will not be considered.

Hospital concedes that a hospital may be liable for the professional judgment of its employees under the apparent agency theory in *Brown*, supra. Because such a theory was properly submitted to the jury, this enumeration need not be further addressed.

8. At the close of all evidence, Hospital renewed its motion for directed verdict and added a new ground, that of "borrowed servant." It contended that even if Jimenez were Hospital's, he was "borrowed" by Dr. Mahoney when he came in the room, absolving Hospital of liability. Enumerations 4 & 5 allege error in denial of the motion on this ground and the failure to instruct the jury on the issue.

The "borrowed servant" does not apply, given the facts. Dr. Mahoney was not present in the operating room when part of the alleged negligence occurred and the first intubation and medication were undertaken, after the laryngospasm occurred. The motion and jury instruction were both correctly denied. *Ross*, supra; *Atlanta Gas Light Co. v. Redding*, 189 Ga. App. 190, 191 (3) (375 SE2d 142) (1988).

9. The remaining enumerations deal with the jury charge. To the extent Hospital objected that certain charges should not have been given because the court should have granted directed verdicts on these issues, it follows from what we have decided above that such charges were not inappropriate.

The court's charges on actual agency (plaintiff's Request 13), apparent agency (plaintiff's Request 24), and the principles of OCGA § 51-2-5 (plaintiff's Request 22) were objected to.

" 'The court's instruction to the jury should be looked to as a whole, and if the applicable law is stated accurately and fairly, in such manner as to work no prejudice, then this court will not consider a challenge to the wording of isolated segments. (Cits.)' *Georgia Kraft Co. v. Laborers' Intl. Union*, 170 Ga. App. 581 (3) (371 SE2d 602) (1984)." *Macon-Bibb County Hosp. Auth. v. Whipple*, 182 Ga. App. 195, 196 (2) (355 SE2d 83) (1987).

Heeding this panoramic concept, we conclude that the court accurately covered these principles and that the charge was not inaccurate or misleading.

It was a correct statement of the law, as the court charged, that if Hospital were found to be providing professional services through its actual or apparent agent, the provision of those services should be judged by the standard of such profession. *Wade v. John D. Archbold Mem. Hosp.*, 252 Ga. 118, 119 (311 SE2d 836) (1984); *Emory Univ. v. Porubiansky*, 248 Ga. 391, 393 (282 SE2d 903) (1981); cf. *Richmond County Hosp. Auth.*, supra.

The appropriateness of the charges based on OCGA § 43-26-9 and on admissions has been determined in Divisions 1 and 2. In addition, with regard to admissions attributable to Hospital, the admission forms and nurses' notations arguably contained several statements adverse to Hospital's interest. These forms and notations were required to be kept as part of the admission clerks' and nurses' job duties. The charge was appropriate.

Hospital contends in general that the charge was confusing and that the court's failure to use the special verdict form submitted by it requires reversal.

The use of such form was not mentioned by Hospital until after its objections to the charge. Failure of a court to so submit the case is not error in the absence of an abuse of discretion. OCGA § 9-11-49; *News Pub. Co. v. DeBerry*, 171 Ga. App. 787, 790 (3) (321 SE2d 112) (1984); compare *Denny v. D. J. D., Inc.*, 186 Ga. App. 727, 730 (3) (368 SE2d 329) (1988). Since both theories upon which suit was brought were properly submitted to the jury, there was no error in failing to use such a form.

*Judgments affirmed. Carley, C. J., and McMurray, P. J., concur.*

DECIDED MARCH 15, 1990 —
REHEARINGS DENIED MARCH 28, 1990 —

*Smith, Gambrell & Russell, David M. Brown, Stephen M. Forte,*

*Marianne Maher, Elizabeth S. Haley,* for appellant (case no. A89A2006).

*Long, Weinberg, Ansley & Wheeler, Robert G. Tanner, Ronald R. Coleman, Jr., Stephen Sparwath,* for appellant (case no. A89A2007).

*Bell & Bell, John C. Bell, Jr., Walbert & Hermann, Paul D. Hermann, James D. Findlay,* for appellees.