## A05A1950. NICHOLS v. THE STATE.
(628 SE2d 131)

RUFFIN, Chief Judge.

After his infant daughter was severely injured while in his care, Johnny Nichols was charged with aggravated battery and two counts of cruelty to children. A Forsyth County jury found him guilty of aggravated battery, one count of cruelty to children, and the lesser included offense of reckless conduct. Nichols appeals, contending that there was insufficient evidence to convict him of aggravated battery and that the trial court erred in admitting certain opinion and expert testimony. Finding no error, we affirm.

"On appeal from a criminal conviction, we view the evidence in [a] light most favorable to the verdict, and the defendant no longer enjoys [a] presumption of innocence."[1] The Court's role is neither to weigh the evidence nor to evaluate witness credibility, but merely to determine whether the evidence is sufficient to prove guilt beyond a reasonable doubt.[2]

Viewed in this light, the evidence shows that in February 2002, Nichols was living with his wife Angela, their son Conner, and infant daughter Taylor. Taylor was born on February 3, 2002. Nichols had lost his job two days before Taylor's birth, but was doing some work for his brother-in-law. Angela was not working. At trial, Angela described the couple's relationship as "rocky" and testified that they "were on the verge of separating." She had accused Nichols of having an extramarital affair, and he had commented "probably half a dozen times" that he did not believe Taylor was his child. Nichols complained that Taylor's crying kept him awake at night, so Angela moved Taylor's bassinet from their bedroom to the living room and Angela slept on the couch in the living room.

On February 18, 2002, Taylor had a routine examination at the pediatrician's office. She appeared healthy and the fontanelle, or "soft spot," on her head was normal. The next day, February 19, 2002, Angela left Taylor with Nichols for about two hours while she accompanied Conner on an errand. There were no bruises or other marks on Taylor when Angela left her. When Angela returned, Nichols informed her that he had taken Taylor into the shower with him, slipped, and fallen. Nichols told Angela that Taylor's face had hit the side of the bathtub. Nichols testified that Taylor landed face down.

Angela saw bruising on Taylor's face and called Scottish Rite Hospital to report what had happened. The hospital told her to

---

[1] *Lugo v. State*, 275 Ga. App. 354 (620 SE2d 591) (2005).

[2] See id.

monitor the baby's condition. Angela placed a second call to Scottish Rite when Taylor's breathing became labored and her eyelids began turning black. The hospital told her to call 911, which she did. Emergency medical personnel responding to the 911 call noted that Taylor was having difficulty breathing, was bruised over her face and neck, and that her fontanelle was very hard, which is a sign of head injury. Her backside and upper leg area were also bruised. She was transported by ambulance to Scottish Rite, and emergency room staff there took pictures of her injuries.

Michael Luster, a medical social worker in the emergency department of the hospital, met with Nichols that evening. Luster interviewed Nichols because Nichols had been with Taylor when she was injured. After consulting the emergency room doctor, Luster reported Taylor's injuries to law enforcement as possible child abuse.

The next morning, February 20, 2002, Dr. Steven Dunton, a forensic pediatrician, examined Taylor. He noted bruising on her face that he believed was made by a hand, specifically two fingers and a thumb of a left hand pressing on her face. She had two "extremely intense" bruises on her buttocks, also. According to Dunton, this bruising resulted from "a very forceful impact [to] the buttocks, possibly being slammed down [on] her buttocks." Dr. Dunton testified that, if the bruises were from a fall, "the entire impact would need to be absorbed by the buttocks to cause the kind of bruising I saw. She wouldn't, for instance, land on her bottom and her back and her head and bruise her bottom that badly because the force would be diffused over a larger area." Taylor also had petechial hemorrhages or "pinpoint bruises" on her eyelids, which were consistent with a hand squeezing her face, or with a seizure.

Dr. Dunton saw from a CT scan and x-rays that Taylor had a linear fracture on the right side of her skull. In addition, she had a subdural hematoma, or bleeding on the surface of her brain. Dr. Dunton further testified that while a skull fracture can occur from a fall, Taylor's skull fracture was inconsistent with Nichols' statement that Taylor had fallen on her face. Rather, she "would have had to have fallen on her back or potentially to her right side." The bleeding on her brain was also inconsistent with a simple fall. Dr. Dunton testified that, in his opinion, Taylor's injuries were not consistent with a fall in the bathtub as Nichols described. On the contrary, he asserted that the injuries were consistent with "non-accidental trauma."

Taylor spent 15 days in the intensive care unit at Scottish Rite. At the time of trial, she was still being treated by a neurologist, a physical therapist, and an occupational therapist.

Nichols was convicted of aggravated battery, one count of cruelty to children, and the lesser included offense of reckless conduct. On appeal, he argues that the trial court erred by: (1) allowing Luster to

testify as to his opinion of the cause of Taylor's injuries when he was not qualified to do so; (2) allowing Dr. Dunton to testify that medical records he reviewed showed that Taylor had suffered seizures; (3) allowing Dr. Dunton to testify that Taylor had suffered a brain injury; and (4) denying his motion for a directed verdict due to insufficient evidence of aggravated battery.

1. The trial court allowed Luster to testify, over Nichols' objection, that he believed Taylor's injuries were inconsistent with the history of events given by Nichols. Nichols contends that this was error because the opinion given by Luster was "outside the domain of the science, art, or trade in which ... Luster was an expert." We review the trial court's admission of expert testimony for abuse of discretion.[3]

Nichols argues that Luster, who is not a medical doctor, did not have the expertise to determine whether Taylor's injuries were caused in the way Nichols described. "An expert is one whose habits and profession endow that person with the particular skill needed in forming an opinion on the subject matter at inquiry."[4] Luster is trained and employed as a medical social worker, and his daily duties require him to consider medical evidence provided to him along with his own observations to determine whether factors are present which could indicate child abuse. As such, Luster's testimony — that the version of events related to him by Nichols was not consistent with Taylor's injuries as reported by the medical staff — was well within his purview as a medical social worker.[5] And persons other than medical doctors may testify about medical issues within the scope of their expertise.[6] Moreover, Luster's testimony was cumulative of Dr. Dunton's testimony that Taylor's injuries "are inconsistent with a fall in the bathtub as described." Under these circumstances, the trial court did not abuse its discretion in allowing Luster's testimony.[7]

2. Nichols objects to Dr. Dunton's testimony that he was aware from Taylor's medical records that she suffered seizures in the emergency room. Nichols asserts that this testimony was hearsay evidence not otherwise in the record and should have been excluded by the trial court.

---

[3] See *Moran v. Kia Motors of America*, 276 Ga. App. 96, 97 (1) (622 SE2d 439) (2005).

[4] (Punctuation omitted.) *Stevenson v. State*, 272 Ga. App. 335, 339 (2) (612 SE2d 521) (2005).

[5] See, e.g., *Adams v. State*, 275 Ga. 867, 868 (3) (572 SE2d 545) (2002) (licensed clinical social worker could give expert testimony as to whether defendant had a mental disorder; fact that she did not have a medical degree went to the weight the jury gave her testimony).

[6] See *Cromer v. Mulkey Enterprises*, 254 Ga. App. 388, 392 (2) (562 SE2d 783) (2002); *Hyde v. State*, 189 Ga. App. 727, 728 (1) (377 SE2d 187) (1988).

[7] See *Richey v. State*, 261 Ga. App. 720, 724-725 (3) (583 SE2d 539) (2003).

Diagnostic opinions and conclusions contained in medical records are generally inadmissable as hearsay unless the person who made them testifies as to their factual basis.[8] However, an expert may express an opinion based on knowledge gained from hearsay during the practice of his profession.[9] An example of this would be a doctor relying on information contained in a patient's medical record as one of the bases for his opinion.[10] In such circumstances, "[e]ven if some of the physician's expert testimony was based upon records which were hearsay because they had not been introduced in evidence, this would go to the weight of the evidence and not its admissibility."[11] Here, Dr. Dunton based his opinion of Taylor's injuries on both his own examination of her and information contained in her medical records. He personally observed some "jitteriness" which suggested possible seizure activity to him. We therefore conclude that the trial court did not abuse its discretion in allowing Dr. Dunton's testimony relating to seizures noted in Taylor's medical records.

3. Nichols also contends that the trial court should have excluded Dr. Dunton's testimony that he believed Taylor had suffered a brain injury because this opinion was merely a restatement of another doctor's opinion. Dr. Dunton testified that initially he reviewed Taylor's CT scan himself and saw a skull fracture and bleeding on her brain. According to Dr. Dunton, Taylor had another CT scan approximately one week later which showed some brain damage. He stated that "the report later of her having experienced what's called hypoxic injury, that is lack of oxygen, lack of blood flow to the brain, that's a more subtle call by a radiologist. I was basing [that testimony] upon [the radiologist's] dictated description of the film." Dr. Dunton did not review the second CT scan because "[he] could tell by the dictation the changes were subtle enough that of [his] own training [he] wouldn't be able to really make the distinction."

Nichols argues that because Dr. Dunton admittedly based his conclusion that Taylor suffered a brain injury on the radiologist's report, this testimony should have been excluded as hearsay. A doctor "may not base his expert opinion solely on the hearsay opinion of another doctor, thereby acting as a mere conduit for the opinion of the first."[12] Here, however, Dr. Dunton was able to make his own diagnosis of a skull fracture and bleeding on the brain, which were indicators of a brain injury. He relied on a radiologist to evaluate the

---

[8] See *Cannon v. Jeffries*, 250 Ga. App. 371, 376 (2) (551 SE2d 777) (2001).

[9] See *Joiner v. Lane*, 235 Ga. App. 121, 126 (4) (508 SE2d 203) (1998).

[10] See id. at 125-126.

[11] (Punctuation omitted.) Id. at 126. See also *Doctors Hosp. of Augusta v. Bonner*, 195 Ga. App. 152, 160 (3) (392 SE2d 897) (1990).

[12] *Doctors Hosp.*, supra at 159.

severity of that injury, specifically whether there had been a lack of oxygen to the brain. Dr. Dunton's opinion that Taylor had suffered a brain injury was not based solely on the radiologist's report; the report merely confirmed the extent of an injury that Dr. Dunton already suspected, based on his own observations and other information. Thus, the trial court did not abuse its discretion in allowing Dr. Dunton to testify that Taylor had suffered a brain injury.[13]

4. A person commits aggravated battery when he "maliciously causes bodily harm to another by depriving . . . her of a member of . . . her body, by rendering a member of . . . her body useless."[14] Nichols alleges that the trial court should have granted his motion for a directed verdict as to aggravated battery because there was insufficient evidence that he deprived Taylor of her brain and skull, as charged in the indictment.

Nichols argues that Dr. Dunton's testimony about Taylor's skull fracture and bleeding on the brain was insufficient to show that she had suffered a loss of normal brain functioning such that she was deprived of the use of her brain. Pretermitting whether this evidence alone could support a conviction for aggravated battery, there was testimony that Taylor spent 15 days in intensive care and that at the time of trial, over a year later, she was still being treated by a neurologist and physical and occupational therapists as a result of her injuries.[15] This evidence was sufficient for the jury to find that Taylor had suffered a loss of normal brain functioning and to convict Nichols of aggravated battery.[16] The trial court thus did not err in refusing to grant a directed verdict to Nichols.

*Judgment affirmed. Johnson, P. J., and Barnes, J., concur.*

DECIDED MARCH 7, 2006 — ▮▮▮▮▮▮▮▮▮

*Marcus C. Chamblee*, for appellant.
*Penny A. Penn, District Attorney*, for appellee.

---

[13] See *Joiner*, supra; *Randall Mem. Mortuary v. O'Quinn*, 202 Ga. App. 541, 543 (1) (414 SE2d 744) (1992) (physical precedent only).

[14] OCGA § 16-5-24 (a). See also *Miller v. State*, 275 Ga. 730, 732 (1) (571 SE2d 788) (2002) (holding that when "a battered victim has suffered a severe injury to [his] brain, resulting in the loss of normal brain functioning, [he is] said to have been 'deprived of [his] brain,' thus suffering an aggravated battery").

[15] It was unclear from the testimony at trial whether Taylor is permanently disabled.

[16] *Harmon v. State*, 208 Ga. App. 271, 272 (1) (430 SE2d 399) (1993); see also *Ganas v. State*, 245 Ga. App. 645, 647 (1) (b) (537 SE2d 758) (2000) (deprivation of use need not be permanent to constitute aggravated battery).