Mary WHITE, Administratrix of
the Estate of Linda Crump,
Plaintiff–Appellant,

v.

METHODIST HOSPITAL SOUTH, Methodist Hospitals of Memphis, Dr. Paul D. Randolph, Dr. Jesse Mullen and Marion G. Lee, Defendants–Appellees.

Court of Appeals of Tennessee,
Western Section, at Jackson.

Aug. 17, 1992.

Application for Permission to Appeal
Denied by Supreme Court
Nov. 30, 1992.

Herschel L. Rosenberg, Leonard E. Van Eaton, Memphis, for plaintiff-appellant.

Thomas R. Prewitt, Jr., Tabitha K. Francisco, Memphis, for defendant Methodist Hospitals of Memphis.

William H. Haltom, Jr., Memphis, for defendants Dr. Mullen and Marion Lee.

Eugene J. Podesta, Jr., Memphis, for defendant Dr. Randolph.

CRAWFORD, Judge.

Plaintiff, Linda Crump, by her conservator and next friend Mary White, appeals from the trial court's order granting summary judgments to Defendants Dr. Paul Randolph, and Methodist Hospitals of Memphis, which were made final pursuant to Rule 54.02, Tenn.R.Civ.P.

Plaintiff's complaint against Defendants, Methodist Hospital South, Methodist Hospitals of Memphis, Dr. Paul D. Randolph, Dr. Jesse Mullen, and Marion G. Lee, alleges in pertinent part: that Methodist Hospital South is a hospital providing medical care and treatment to the general public either as an independent hospital or as a satellite hospital of Defendant Methodist Hospitals of Memphis. Methodist Hospitals of Memphis is a corporation under the laws of the State of Tennessee providing medical care and medical treatment as a hospital to the general public. Dr. Paul Randolph is a duly licensed medical doctor specializing in the field of obstetrics and gynecology. Dr. Jesse Mullen is a duly licensed physician in the State of Tennessee and engages in the specialty practice of anesthesiology and at all times pertinent to this case was acting either as the agent or employee of Defendant Methodist Hospital South and/or Methodist Hospitals of Memphis and/or Whitehaven Anesthesia Group, P.C. Defendant Marion G. Lee was a nurse anesthetist and was at all times pertinent acting as an employee or agent of Defendant Mullen and/or Defendant Methodist Hospital South and/or Methodist Hospitals of Memphis and/or Whitehaven Anesthesia Group, P.C.

Linda Crump, age 33, had been Dr. Randolph's patient for a number of years and on February 7, 1985, she entered Methodist Hospital South at the direction of Dr. Randolph, for the purpose of having a mini-lap sterilization performed. The procedure, elective surgery commonly called a tubal ligation, was to be done on an outpatient basis, meaning that she was to have surgery in the morning, stay in the hospital for a short period of time and then return home the same afternoon.

She arrived at the hospital at approximately 5:45 a.m. and at approximately 7:05 a.m. her vital signs were: temperature, 99.4 degrees; pulse, 76; blood pressure, 130/90. At approximately 8:50 a.m. employees of Hospital and/or of Dr. Mullen and/or of Dr. Randolph administered pre-operative medication to her and she began to experience a headache. She spoke to Dr. Randolph prior to surgery and told him she had a headache and was extremely apprehensive about the surgery. At approximately 9:45 a.m. Defendant Marion Lee, the nurse anesthetist, obtained her medical history. This was the first discussion between these parties regarding her medical history, and she informed Ms. Lee of her history of hypertension.

At approximately 9:45 a.m. or shortly thereafter, she was taken to the operating room and at approximately 10:02 a.m. her vital signs were recorded as follows: blood pressure 168/115 and pulse, 95. Her vital signs were again taken at approximately 10:15 a.m. and were: blood pressure, 138/90 and pulse rate, 115; temperature 99.4 degrees. Between 10:15 a.m. and 10:20 a.m. her pulse rate abruptly went to 212 beats per minute and additional medication was administered to her by Defendant Marion Lee, acting independently or under the orders of Defendant Dr. Mullen, in an effort to decrease her pulse rate, and it decreased to 120 beats per minute.

Surgery began at approximately 10:20 a.m., and, after the initial incision was made by Dr. Randolph, the primary physician and surgeon, her pulse rate again went to well over 200 beats per minute. Additional medications were administered, and her blood pressure dropped to 90/42 with a pulse rate of 42 beats per minute. It was noted on the record that at 10:33 a.m. she had experienced cardiac arrest. As a direct and proximate result of defendants' acts of negligence, plaintiff suffered severe and permanent brain damage.

The complaint further alleges that all of the defendants owed her a duty to properly examine her and to determine if it was in her best interest for the surgery to proceed after the difficulties which had arisen. The defendants were guilty of the following acts of negligence or deviations from the standard of care recognized in the community which were the direct and proximate causes of her permanent injuries namely:

a. Failure to perform proper preliminary diagnostic procedures.

b. Failure to obtain consultations from proper medical specialists when her history and condition on the morning of February 7, 1985 required it;

c. Failure to properly oxygenate Linda Crump prior to and during induction of anesthesia;

d. Failure to sufficiently sedate Linda Crump prior to intubation and surgery.

e. Failure to allow sufficient time for Linda Crump's condition to stabilize following her initial attack of tachycardia;

f. Failure to properly monitor Linda Crump during induction and surgery;

g. Failure to discontinue Linda Crump's elective surgery when it was apparent that the continuation of the surgery was gravely dangerous and not in her best interests;

In its answer, Defendant Methodist admits that Dr. Mullen does engage in the practice of anesthesiology in Tennessee, but denies that he was either an agent or an employee of Methodist. The answer also admits that Defendant Marion Lee is a certified nurse-anesthetist but denies that Ms. Lee was an employee and/or agent of Methodist. Methodist admits that plaintiff was admitted to Methodist South on February 7, 1985, and that Defendant Dr. Randolph performed surgery on her with Dr. Mullen and Nurse Lee in attendance as anesthesiologist and nurse anesthetist respectively but denies all other material allegations in the complaint.

Methodist affirmatively alleges that all of its agents and/or employees who undertook to render medical care to Ms. Crump did so in complete compliance with the applicable standard(s) of care and that any injuries Ms. Crump sustained were occasioned by unanticipatable medical complications beyond the control of Methodist. Alternatively, Methodist alleges that in the

event it is established that the injuries sustained by Ms. Crump were occasioned by a violation of the applicable standard(s) of care, such violation is not imputable to it but resulted from the acts or omissions of unrelated, independent third parties.

In his answer, Dr. Randolph alleges that plaintiff's complaint fails to state a cause of action upon which relief can be granted and that the cause of action is barred by the applicable statute of limitations. He avers that he cared for and treated Plaintiff in accordance with the required and accepted standard of care and that he was innocent of any act or omission constituting medical malpractice. He further avers that any injuries which plaintiff suffered were due to independent intervening acts of others, that he could not anticipate these acts and therefore is not responsible for them.

▬▬ Both Methodist Hospitals and Dr. Randolph filed motions for summary judgment. The trial court granted both motions. Summary judgment is to be rendered by a trial court only when it is shown that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Tenn.R.Civ.P. 56.03 (1984). When a motion for summary judgment is used defensively, the plaintiff must present evidence sufficient to establish the essential elements of his claim on which he will bear the burden of proof at trial. *Blair v. Allied Maintenance Corp.*, 756 S.W.2d 267, 269–270 (Tenn.App.1988). In ruling on a motion for summary judgment, the trial court and the Court of Appeals must consider the matter in the same manner as a motion for a directed verdict made at the close of the plaintiff's proof, i.e., all the evidence must be viewed in the light most favorable to the opponent of the motion and all legitimate conclusions of fact must be drawn in favor of the opponent. It is only when there is no disputed issue of material fact that a summary judgment should be granted by the trial court and sustained by the Court of Appeals. *Graves v. Anchor Wire Corp. of Tennessee*, 692 S.W.2d 420 (Tenn.App. 1985); *Bennett v. Mid–South Terminals Corp.*, 660 S.W.2d 799 (Tenn.App.1983).

Plaintiff has appealed, and the first issue for review is whether the trial court erred in granting Methodist Hospital's motion for summary judgment.

Pertinent testimony concerning this issue as revealed by the record is as follows:

### AFFIDAVIT OF LARRY DEPRIEST:

On February 7, 1985, he was the chief executive officer for Methodist Hospital South, and at that time, Drs. Randolph and Mullen were on the staff at the hospital. The hospital did not attempt in any way to control these physicians and was not authorized to direct either physician in the practice of his respective specialty. Neither physician had the authority to take any action in the name of the hospital.

### AFFIDAVIT AND DEPOSITION OF KAY MEREDITH SPIDLE:

She is a licensed practical nurse and has been employed at Methodist Hospital South for fifteen years. She understands that Dr. Mullen worked for the hospital and there has never been another anesthesiologist at the hospital except when Dr. Mullen would go on vacation. Dr. Mullen and Ms. Lee dressed in the same type clothing as the other attendants in the operating room. She was present in the operating room on February 7, 1985, during the Crump procedure. She is familiar with the standard of care required of nursing personnel in operating rooms in Memphis, Tennessee, and in her opinion, the conduct of all of the nursing personnel involved in the Crump procedure complied with the standard of care required.

### AFFIDAVIT AND DEPOSITION OF BETTY J. KIMBLE:

She is a registered nurse, has been employed by Methodist Hospital South since 1974 and Dr. Mullen was at the hospital when she first started to work there. The only time she has ever seen any other anesthesiologist do work at Methodist Hospital South was when Dr. Mullen was on vacation or otherwise unavailable. Dr. Mullen had an office behind Operating

Room No. 5 and there was nothing on the office door that would indicate that he is separate and apart from the hospital. She understands that Dr. Mullen and his group are hired by the hospital to give anesthesia as needed at the hospital. They wore the same type of uniform in the operating room as Methodist Hospital personnel. She was present on February 7, 1985, in connection with the Crump procedure and was acting as a "circulating nurse". Based on her training and experience, she was familiar with the standard of care of nursing personnel in operating rooms in Memphis, Tennessee. Based upon her knowledge, she is of the opinion that the conduct of all nursing personnel involved in the procedure fully complied with the standard of care required.

### AFFIDAVIT OF DR. JAMES B. HUNTER, JR.:

He became vice-president of Methodist Hospital South during the first week of March, 1985, and he signed the contract on behalf of Methodist Hospital South with Dr. Mullen shortly after he came. He doesn't recall any agreements between the hospital and Dr. Mullen for the years 1986, 1987 or up to the time of the deposition. Methodist Hospital South provides the equipment and the medication for the anesthesiology department and the hospital has an anesthesiologist on call twenty-four hours a day as a service to the public. Dr. Mullen, paid no rent for his office at the hospital. He was not listed on the directory at the hospital, nor was he accessible to the general public.

### DEPOSITION OF DR. PAUL C. RANDOLPH:

Normal procedure is that the hospital chooses the anesthesiologist and that to his knowledge there are no other anesthesiologists utilized by Methodist Hospital South except Dr. Mullen.

Plaintiff contends that the trial court erred in granting Defendant Methodist summary judgment because there is a genuine issue of material fact as to whether Dr. Mullen and Nurse Lee were employees and/or agents of Methodist or, in the alternative, whether agency by estoppel and/or apparent agency renders Methodist liable for the negligence of these parties.

 Apparent agency is essentially agency by estoppel; its creation and existence depend upon such conduct by the apparent principal as will preclude him from denying another's agency. *Kelly v. Cliff Pettit Motors*, 191 Tenn. 390, 234 S.W.2d 822 (1950). Generally, to prove apparent agency one must establish (1) the principal actually or negligently acquiesced in another party's exercise of authority; (2) the third person had knowledge of the facts and a good faith belief that the apparent agent possessed such authority; and (3) the third person relied on this apparent authority to his or her detriment. *Oppenheimer v. Wooline*, 4 Tenn.Civ.App. 134 (1834). See also *Southern Railway Co. v. Pickle*, 138 Tenn. 238, 197 S.W. 675 (1917) and Am.Jur.2d *Agency*, §§ 19 and 80 (1986).

 Methodist contends that since there is no direct proof in the record regarding plaintiff's reliance that she cannot maintain a cause of action on the theory of ostensible or apparent agency. We respectfully disagree.

In *Edmonds v. Chamberlain Memorial Hospital*, 629 S.W.2d 28 (Tenn.App.1981), plaintiff's decedent had presented himself to defendant's emergency room where he was examined by an emergency room physician and sent home. Decedent's condition became worse, but upon being informed of the development, the emergency room physician did not tell him to come back to the hospital. He returned the next morning to the hospital because of the difficulties he had experienced during the night, was examined by a surgeon, and surgery was then performed. Plaintiff died a few days later. The question arose as to whether the hospital should be liable for the emergency room physician's actions due to his relationship to the hospital. The trial court granted the hospital summary judgment and plaintiff's decedent appealed. The hospital maintained that it should not be held liable for the physician's actions because

the physician was neither an agent of the hospital nor its employee, but an independent contractor. The *Edmonds* court held:

> We conclude the record in this case establishes a disputed issue of material fact as to whether or not Dr. Loftis was the hospital's *agent.* (Emphasis added.)

629 S.W.2d at 32.

Although the court in *Edmonds* does not deal directly with the question of reliance by inference, and in fact, appears to hold that the emergency room physician might have been the actual agent of the hospital, a close reading of the opinion shows that the court based its decision on the presence of factors which indicated that apparent or ostensible agency existed.

> The emergency room is operated in conjunction with defendant's other hospital facilities and it is required to staff the facility with physicians to treat members of the public who come to the hospital for emergency medical care. *The patient does not know or select the physician but relies upon the hospital for providing the physician.* Significantly, when decedent's condition worsened after being turned away by Dr. Loftis, plaintiff called the hospital and apprised Dr. Loftis of the decedent's condition rather than attempting to contact the treating physician. (Emphasis added.)

629 S.W.2d at 32. Thus, although the court cited no direct proof of decedent's reliance in its opinion, it found that where the patient "does not know or select the physician" the patient "relies upon the hospital for providing the physician." *Id.* (Emphasis added.)

In the present case, plaintiff has presented testimony to show that Methodist, not the plaintiff, chose Dr. Mullen to administer the anesthesia and that Methodist offered an anesthesiologist as a service to the public.

An increasing number of jurisdictions have held that in situations where a hospital offers a service, such as the care of an anesthesiologist, and the patient has no part in choosing the individual who will perform the service, a court may infer that the patient reasonably relied on the health care provider's apparent authority to act for the hospital. As the court stated in *Uhr v. Lutheran General Hospital,* 226 Ill.App.3d 236, 168 Ill.Dec. 323, 589 N.E.2d 723 (1992):

> Cases from other jurisdictions have concluded that unless there is some reason for a patient to believe that the treating physician in a hospital is an independent contractor, it is natural for the patient to assume reliance on the reputation of the hospital as opposed to any specific doctor. This reliance is often the reason the patient selects the hospital in the first place and these cases recognize his prerogative to make that assumption. *Arthur v. St. Peters Hospital,* 169 N.J.Super. 575, 405 A.2d 443 (1979).

\* \* \* \* \* \*

[A] hospital should be vicariously liable for doctors in emergency or *operating room settings* notwithstanding the existence of a private contract with secret limitations between hospital and doctor or by virtue of some other business relationship unknown to the patient and contrary to the hospital's apparent representation. Patients often seek care and treatment from hospitals rather than from particular physicians. The patient entering the emergency room or *operating theater* seldom knows the name of the emergency medicine physician or *anesthesiologist* who will treat him. *Smith v. St. Francis Hospital, Inc.* (Okla.App.1983), 676 P.2d 279.

Although there may be important factual variations from case to case, a patient's non-selection of his physician is often the rule, rather than the exception, in the case of *anesthesiologists,* neurologists and emergency room physicians. Accordingly, it seems only reasonable that the hospital should be vicariously responsible for the neglect of its staff members. *Buckley v. Lovallo* (1984), 2 Conn.App. 579, 481 A.2d 1286; *Mitchell County Hospital Authority v. Joiner* (1972), 229 Ga. 140, 189 S.E.2d 412. (Emphasis added.)

In a case factually similar to the one at bar, *Doctors Hosp. of Augusta v. Bonner,*

195 Ga.App. 152, 392 S.E.2d 897 (1990), plaintiff's decedent, a thirty-eight year female, entered defendant hospital for knee surgery. Surgery was performed, but decedent never regained consciousness. Decedent's representative and family filed a medical malpractice action against the hospital and anesthesiologist and obtained a jury verdict against all defendants.

On appeal the hospital argued that the trial court erred in failing to direct a verdict in its favor on the issue of apparent or ostensible agency because (1) there was insufficient evidence of reliance by decedent, and (2) the doctrine applies only to emergency room physicians. The Georgia Court of Appeals disagreed. The court noted that Georgia had adopted the doctrine of apparent agency in medical malpractice actions. The court further noted that the narrow application of the theory to emergency rooms only had been rejected by Georgia courts and that courts of other jurisdictions had extended the rationale to anesthesiologists. On the question of reliance, the court stated:

> [As to decedent's reliance on the hospital], there was no direct evidence of affirmative statements made by her but such reliance is subject to proof by circumstantial evidence ... [Evidence in the record] was adequate for an inference of reliance. Denial of the directed verdict on this ground was not error.

392 S.E.2d at 907.

In light of the court's holding in *Edmonds* and in light of the increasing tendency of courts in other jurisdictions to infer reliance in the hospital setting, we believe that under the proof and circumstances of this case that plaintiff has presented enough evidence to create a genuine issue of material fact as to whether Dr. Mullen and Nurse Lee were the apparent agents of Methodist.

The next issue for review is whether the trial court erred in granting summary judgment to Dr. Randolph.

Actions against physicians for malpractice are now governed by T.C.A. § 29–26–115 (1980) which provides in pertinent part:

(a) In a malpractice action, the claimant shall have the burden of proving by evidence as provided by subsection (b):

(1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which he practices or in a similar community at the time the alleged injury or wrongful action occurred;

(2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and

(3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

\* \* \* \* \* \*

In order to overcome Dr. Randolph's motion for summary judgment, plaintiff must present evidence sufficient to raise a genuine issue of material fact on each element prescribed by this statute.

This defendant concedes that for the purpose of summary judgment we must assume that he was apprised of Ms. Crump's problems as detailed in the testimony of Dr. Mullen and Nurse Lee. It is also conceded, at this stage of the proceedings only, that the operating physician's standard of care required a postponement of surgery and that this standard of care was breached. Dr. Randolph argues however that plaintiff has failed to produce evidence to satisfy the third requirement of T.C.A. § 29–26–115 regarding the establishment of proximate cause.

 Proximate cause means that which was the procuring and efficient cause of the plaintiff's damage or injury and indicates nearness in causal relation, but it need not be the last act, the one nearest to the injury or damage, or the sole cause. *Kroger Co. v. Giem*, 215 Tenn. 459, 387 S.W.2d 620 (1964). The testimony of experts as to the probable cause of injury is subject to the same rules applied to testimony of experts as to the probable effect of injury; the testimony must show that such result is reasonably certain and not a mere likelihood or possibility. *Re-*

*serve Life Insurance Co. v. Whittemore,* 59 Tenn.App. 495, 442 S.W.2d 266 (1969). In a medical malpractice action, plaintiff must show more than the mere possibility of causation in order to sustain the burden of proof. See *Whittemore v. Classen,* 808 S.W.2d 447 (Tenn.App.1991). A judgment cannot be based on conjecture or speculation, and the probable effect of an injury must be shown to be reasonably certain, and not a mere likelihood or possibility. *Maryland Cas. Co. v. Young,* 211 Tenn. 1, 362 S.W.2d 241 (1962).

 We will review the pertinent testimony concerning this issue as revealed by the record.

### DEPOSITION OF DR. JEFFREY LIPSHITZ:

He is an obstetrician/gynecologist who practiced in Tennessee until December, 1984, and currently practices in Las Vegas, Nevada. We quote a portion of his testimony from the record:

[T]he patient during this early stage ... between what looks like 10:00 a.m. and 10:15 to 25, in there, was showing signs of something drastically wrong. I would theorize that the problem was lack of oxygen.

The obstetrician [Dr. Randolph] came into the room to do the surgery, and I'm not sure from the records how much he did or did not know, but this patient was in an unstable condition with unstable vital signs, having received drugs to try and improve the vital signs.

I think that that is somewhat masking, you know, you've got vital signs going wrong, I think the question to be asked was, Why were these vital signs as out of line as they were? I think right then instead of proceeding someone should have stopped and reviewed what was going on.

\* \* \* \* \* \*

Q. The third opinion you expressed about the nurse, ... was that she didn't inform the surgeon of the patient's vital signs?

A. That's correct.

Q. All right, sir. You base your opinion that the nurse didn't inform the surgeon of this on the record and on his testimony?

A. Yes.

\* \* \* \* \* \*

Q. Do you have an opinion as to whether this alleged failure to inform the surgeon of vital signs caused injury to this patient?

A. Yes, I think if she would have let him know that the pulse rate had been 212, he might have asked to stop the case right at that stage and the brain damage would—may not have occurred.

Q. Can you state within a reasonable degree of medical certainty that the brain damage would not have occurred had the nurse given the surgeon all of the vital signs?

A. No, I cannot. It seems reasonable that the shorter the period of hypoxia, the less chance this patient would have had of hypoxic encephalopathy. And therefore, by shortening the period of time without oxygen, the much more chance there would have been to have— to minimize the brain damage.

Q. Dr. Lipshitz, let me ask you about the opinion you expressed earlier about the surgeon.

I believe you told me that you are of the opinion that the surgeon should not have proceeded with this elective procedure; is that correct?

A. That's correct.

Q. Is it your opinion that the surgeon in proceeding deviated from the standard of care?

A. Yes.

Q. Would you tell me specifically on what you base your opinion that the surgeon deviated from the standard of care in proceeding with the procedure?

A. He opted for an elective procedure on a very unstable patient.

Q. Is there anything else you base your opinion on other than what you just told me?

A. No.

Q. Do you have an opinion, sir, within a reasonable degree of medical certainty as to whether this failure, or alleged failure, by the physician caused any of the injuries to the patient in this case?

A. I feel again it's prolonged period of time with no oxygen to this patient's brain, and again, as I've stated, all the time that we prolong this will cause more injury. So there's a direct relationship to the period of time where this process is prolonged and the degree of brain damage. So the answer is, yes, by scrubbing and operating he'd prolong this period of time.

\* \* \* \* \* \*

## DEPOSITION OF DR. PAUL RANDOLPH:

We quote from the record:

Q. Tell me what happened when you got into the operating room after you had scrubbed and gowned yourself.

A. Well, I did a pelvic examination on the patient. I put a Foley in. We put her down, and I prepped her abdomen, which her abdomen was already prepped by the circulator, so I prepped her again myself and draped her. And I turned to the anesthetist and said, is everything all right; can we go ahead? She said yes, just a little tachycardia. I looked up at the monitor. It was going about 150, so I waited momentarily. It came back down to 100, and I said, well, would it be all right to go ahead? And she said, yes, go ahead.

\* \* \* \* \* \*

Q. Then tell me what happened, sir.

A. I made a skin incision only, and of course after making a skin incision, I turned for a clean knife to go deeper. And as I turned back, I noticed the monitor with the pulse getting higher. And I stopped and looked, and it got up around 200, and I told her I wasn't going to do the procedure; to wake her up, and I proceeded to close the skin.

Q. Did they attempt to wake her up?

A. No, they couldn't.

\* \* \* \* \* \*

Q. Do you recall Dr. Mullen ever being in the operating room?

A. He was at the table when I came back in the room from scrubbing.

Q. Now, did you look at the operative and anesthesia record concerning Ms. Crump when you came back in from scrubbing?

A. No, I did not.

Q. Were you aware there had been a prior tachycardia?

A. No, I was not.

\* \* \* \* \* \*

A. I don't know exactly what time I came into the operating room from scrubbing, but regardless of what time I came in there, I was not aware that this patient was having this—[tachycardia].

\* \* \* \* \* \*

Q. Doctor, after you—after you scrubbed, you came in. You commenced then with a skin incision. You're saying you then noticed the monitor showing 150 heart rate; is that correct?

A. I noticed the monitor—I didn't pay attention to the monitor while I was prepping. I did a vaginal examination on the patient. I put a Foley in. I prepped the abdomen, and I didn't notice the monitor at the time, because I really didn't know the patient was having any problems, so I didn't have any reason to look up. I said, is everything okay; can I go? And she said, we have a little tachycardia. And I looked up at the monitor, and it was around 150. And I waited momentarily, and it went down to 100, and then I said, well, can we go ahead? She said, Yes. So I made a skin incision. I turned to get my clean knife to go deeper, and when I turned back around and I checked the monitor again, I noticed the pulse going up.

## DEPOSITION OF DR. JESSE MULLEN:

We quote from the record:

A. Dr. Randolph—at that time I noticed he came into the room. Whether he was in the room earlier or not I don't know, but he had been scrubbing his hands, I believe, and he was gowning,

and I told him that the pulse had been up to about 200, and we gave some Inderal to slow it down, and she seemed to be stabilized and in acceptable range, and I thought we could probably proceed with the case, proceed with the intubation.

Q. When it says that the decision was made was this your decision, his decision or both of your decisions?

A. It was a joint decision.

### DEPOSITION OF NURSE MARION LEE:

We quote from the record:

Q. Was Dr. Randolph still out scrubbing at this time?

A. Yes, he was.

Q. Tell me what happened next.

A. As soon as Dr. Mullen came in, Dr. Mullen started giving her medication, and I told Dr. Randolph what had happened, and so he just stood there.

Q. Dr. Randolph had now come back in?

A. Yes, sir. He was back in there then, after Dr. Mullen had already come back in.

Q. I'm saying when Dr. Mullen came in, you're saying he then prescribed certain medications?

A. Yes, sir.

Q. When Dr. Mullen was prescribing these medications, had Dr. Randolph come back into the operating room?

A. Yes.

Q. So he was there present when all this was going on too.

A. Well, the pulse was coming down again when he got there, but Dr. Mullen—I told him that Dr. Mullen was in there to give her this stuff, because her pulse had been way up.

\* \* \* \* \* \*

Q. What would you estimate, if you can, the time frame from the time you asked someone to go get Dr. Mullen to the time he came into the room?

A. I would say two minutes at the longest.

Q. And during that two minutes you gave her the two milligrams of Inderal?

A. .2 tenths.

Q. Then what happened?

A. Then her pulse started coming down, so by this point, I said, Dr. Randolph was already in there, and we had told him it had been up, but Dr. Mullen said it's coming down, and I think we can proceed with the case. And they both kind of decided between them it was all right to proceed with it.

Q. How much time elapsed from the time you looked up and called Dr. Mullen, to the time Dr. Randolph came back in and the decision was made to continue on with the case?

A. I don't know; probably five minutes total.

Dr. Lipshitz's testimony concerning causation could perhaps be viewed as confused or even contradictory. However, his testimony taken as a whole can be interpreted as stating that Dr. Randolph's failure to postpone the procedure immediately upon acquiring knowledge of Ms. Crump's previous tachycardia caused injury to Ms. Crump.

Q. Do you have an opinion, sir, within a reasonable degree of medical certainty as to whether this failure, or alleged failure, by the physician caused any of the injuries to the patient in this case?

A. I feel again it's prolonged period of time with no oxygen to this patient's brain, and again, as I've stated, all the time that we prolong this will cause more injury. So there's a direct relationship to the period of time where this process is prolonged and the degree of brain damage. *So the answer is, yes,* by scrubbing and operating he'd prolong this period of time. (Emphasis added.)

T.C.A. § 29–26–115(a)(3) requires that plaintiff show that she suffered injuries which would not have otherwise occurred except for the negligent act of the physician. The above quoted testimony is to that effect and creates a genuine issue of material fact in that regard.

In *Evco Corporation v. Ross,* 528 S.W.2d 20 (Tenn.1975), the court said:

... The summary judgment procedure was designed to provide a quick, inexpen-

sive means of concluding cases, in whole or in part, upon issues as to which there is no dispute regarding the material facts. Where there does exist a dispute as to facts which are deemed material by the trial court, however, or where there is uncertainty as to whether there may be such a dispute, the duty of the trial court is clear. He is to overrule any motion for summary judgment in such cases, because summary judgment proceedings are not in any sense to be viewed as a substitute for a trial of disputed factual issues.

528 S.W.2d at 24–25.

After an exhaustive review of the record in this case, we are of the opinion that genuine issues of material fact are established concerning the actions against Dr. Randolph and Methodist Hospital. Accordingly, the orders of the trial court granting summary judgment of these defendants are reversed and this case is remanded to the trial court for such further proceedings as may be necessary. The costs of appeal are assessed equally against the appellees, Dr. Randolph and Methodist Hospital.

TOMLIN, (P.J., W.S.) and HIGHERS, JJ., concur.