IN THE COURT OF APPEALS

FILED

**July 2, 1997**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

| | | |
|---|---|---|
| REBA V. DAVIS and TYLER WAYNE DAVIS by next friend, REBA V. DAVIS, | ) ) ) | ROANE CIRCUIT C. A. NO. 03A01-9701-CV-00016 |
| Plaintiffs-Appellants | ) ) | |
| | ) ) ) ) ) | |
| vs. | ) ) | HON. RUSSELL E. SIMMONS, JR. JUDGE |
| | ) ) ) ) ) | |
| HARRIMAN CITY HOSPITAL, THE CITY OF HARRIMAN, JEAN ANGELO, BRENDA RUTHERFORD, BETTY SAMPSON, RHONDA MARTIN, MELINDA LATHAM, SHARON UNDERWOOD and VICKIE KLINNERT, | ) ) ) ) ) ) ) ) | AFFIRMED AND REMANDED |
| Defendants-Appellees | ) | |

DAVID C. LEE, Lee, Lee & Lee, Knoxville, for Appellants.


HAROLD D. BALCOM, JR., Kingston, for Appellee, City of Harriman Hospital.


GERALD LARGEN, Kingston, for Appellees, Jean Angelo, Brenda Rutherford, Rhonda Martin, Sharon Underwood, and Vickie Klinnert.


O P I N I O N

McMurray, J.

This is a medical malpractice case. Plaintiff, Reba V. Davis brought suit, individually and on behalf of her infant son, Tyler, against Dr. Elbert Cunningham, Harriman City Hospital and the City of Harriman for injuries sustained by Tyler shortly after his birth. After reaching a settlement with Dr. Cunningham, the physician who delivered Tyler, Ms. Davis amended her complaint to include allegations of negligence against the attendant Harriman City Hospital nurses.[1]

The defendants moved for summary judgment. The court granted summary judgment on the ground that the plaintiff had failed to present proof, in contravention of that offered by the defendants, that any alleged negligence on the part of the defendants, was a proximate cause of Tyler's injuries. Ms. Davis has appealed and challenges the propriety of the summary judgment. We affirm the judgment of the trial court.

The only issue presented, as stated in the plaintiff's brief, is "whether material evidence exist[s] in the record sufficient to overturn the Trial Court's granting of summary judgment as to the five nurses, and consequently their employer?"

_____

[1]Ms. Davis settled the claims against two of the nurses, Betty Sampson and Melinda Latham, therefore, this appeal concerns the remaining five nurses, Jean Angelo, Brenda Rutherford, Rhonda Martin, Vickie Klinnert, and Sharon Underwood and their employer, Harriman City Hospital.

Our standard of review in considering the propriety of summary judgment is as follows:

> The standards governing an appellate court's review of a trial court's action on a motion for summary judgment are well settled. Since our inquiry involves purely a question of law, no presumption of correctness attaches to the trial court's judgment, and our task is confined to reviewing the record to determine whether the requirements of Tenn. R. Civ. P. 56 have been met. Cowden v. Sovran Bank/Central South, 816 S.W.2d 741, 744 (Tenn. 1991). Tenn. R. Civ. P. 56.03 provides that summary judgment is only appropriate where: (1) there is no genuine issue with regard to the material facts relevant to the claim or defense contained in the motion, Byrd v. Hall, 847 S.W.2d 208, 210 (Tenn. 1993); and (2) the moving party is entitled to a judgment as a matter of law on the undisputed facts. Anderson v. Standard Register Co., 857 S.W.2d 555, 559 (Tenn. 1993). The moving party has the burden of proving that its motion satisfies these requirements. Downen v. Allstate Ins. Co., 811 S.W.2d 523, 524 (Tenn. 1991).

> The standards governing the assessment of evidence in the summary judgment context are also well established. Courts must view the evidence in the light most favorable to the nonmoving party and must also draw all reasonable inferences in the nonmoving party's favor. Byrd, 847 S.W.2d at 210-11. Courts should grant a summary judgment only when both the facts and the conclusions to be drawn from the facts permit a reasonable person to reach only one conclusion. Id.

Carvell v. Bottoms, 900 S.W.2d 23, 26 (Tenn. 1995).

The material facts are undisputed. Dr. Cunningham delivered Tyler by caesarian section on June 12, 1991, at 10:39 P.M Tyler exhibited a normal and healthy appearance, and vital signs were within the normal ranges except for relative tachypnea (faster breathing rate than normal). Dr. Cunningham instructed the nurses on duty to "follow closely" Tyler's progress. Dr. Cunningham

returned to check on Tyler at 10:55 and 11:15 P.M. Dr. Cunningham testified to the following regarding Tyler's condition at 11:15 P.M:

> Well, the respiratory rate at that time was 56 which is a little high but not terribly alarming. Temperature was normal and heart rate was, I believe, 156. So it was just one of these things, this baby is having a little bit of trouble getting started, the lungs are not expanding, loosening up quite as rapidly as we would like, but still seemed to be okay.

The record indicates that nothing eventful occurred for the next 3 hours, and that Tyler was generally "resting quietly" with even respiration. At around 3:45 A.M, the attending nurses noted that respiration was about 80 per minute, well above the normal rate, and that Tyler was exhibiting cyanosis (bluish coloration) around the extremities and mouth. The nurses administered "blows" of oxygen, which entailed turning on an oxygen tank connected to a catheter, and holding the catheter in the general vicinity of the infant's nose and mouth to help him breathe more easily. The nurses also summoned Dr. Cunningham. At 3:55 A.M, Dr. Cunningham observed the situation and instructed the nurses to "just watch [the] infant closely."

At 4:00 A.M, the nurses administered more oxygen. The nurses' notes indicate that at 5:30 A.M, Tyler was cyanotic in color and had "floppy arms." More blows of oxygen were given, which improved his color. The nurses' notes show that Dr. Cunningham checked on

4

Tyler's condition at 7:00 A.M., at which time the attending nurses informed him that Tyler's color had been "dusky." Dr. Cunningham opined at the time that Tyler's condition was "probably transitional." From approximately 7:20 A.M., Tyler's condition deteriorated, and he began exhibiting more alarming symptoms of respiratory distress.

Dr. Cunningham testified that by 8:45 A.M., "it became apparent to [him] that Tyler was not improving" and he made the decision to transfer him to East Tennessee Children's Hospital. The children's hospital pediatric team arrived around 10:15 A.M., and transferred Tyler by ambulance at 12:30 P.M. Dr. Cunningham's discharge diagnosis was: "Tachypnea of newborn with progressive deterioration of general condition, acidosis and shock-like state, etiology undetermined. Possible septicemia or possible congenital heart defect was entertained as diagnosis when it left."

As a result of Tyler's deteriorating condition and respiratory difficulties, he suffered brain damage and is seriously handicapped. Neither Dr. Cunningham nor subsequent treating physicians were able to definitively determine a cause or origin of his medical condition.

As noted above, after reaching settlement with Dr. Cunningham, Ms. Davis amended the complaint on Tyler's behalf to include

allegations of negligence by the nurses in attendance and Ms. Brenda Rutherford, the hospital's Director of Nursing. Five of the defendants, Nurses Jean Angelo, Brenda Rutherford, Rhonda Martin, Vickie Klinnert, and Sharon Underwood moved for summary judgment.

In opposition to the motion for summary judgment, Ms. Davis filed the affidavit of Ms. Christine Busch, an R.N., licensed in Virginia. In her affidavit, Nurse Busch stated that the defendants breached the standard of care required of nurses in community hospitals such as Harriman on several occasions, including "fail[ing] to recognize in Tyler Wayne Davis, symptoms of respiratory distress syndrome ..." The trial court correctly noted that Nurse Busch's affidavit was sufficient to create a genuine issue of material fact on the question of the defendants' alleged negligence.

Ms. Davis' counsel stipulated, however, that Nurse Busch was not qualified to give expert testimony on medical causation, and that she was not being offered as a causation witness. Ms. Davis presented the deposition testimony of Dr. Joseph B. Philips, III, for proof on the causation issue. The trial court found the following:

> The Court finds that the parties have not disputed the opinion of the plaintiff's expert witness, Dr. Joseph B. Philips, III, that the causation of the plaintiff's injury was the failure to more aggressively intervene to

6

diagnose and treat the plaintiff. He also indicated that the medical person responsible to diagnose and institute treatment was Dr. Cunningham.

Dr. Cunningham in his deposition indicated that he was kept fully aware of the condition of the patient by the defendant nurses, and that it was his responsibility to diagnose and institute appropriate treatment which included the administering of oxygen.

* * *

The Court finds from the above that any breach of the standard of care by the nurse defendants was not the cause of any personal injury to the plaintiff and that the Motion for Summary Judgment should be sustained.

T.C.A. § 29-26-115 requires a claimant to prove that the defendant's negligence was the cause of his or her injuries. It provides in pertinent part as follows:

(a) In a malpractice action, the claimant shall have the burden of proving by evidence as provided by subsection (b):

* * *

(3) as a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred;

* * *

For summary judgment purposes, once a plaintiff is faced with a properly supported motion, he or she must present evidence at least sufficient to raise a genuine issue of material fact as to whether the defendants' alleged negligence was the proximate cause of her injuries. Kilpatrick v. Bryant, 868 S.W.2d 594 (Tenn. 1993); White v. Methodist Hosp. South, 844 S.W.2d 642 (Tenn. App.

7

1992). Thus, as Ms. Davis has noted in her brief, "the question herein is whether Dr. Philips' testimony combined with that of Nurse Busch establish[es] causation against the five nurses, and consequently their employer under the doctrine of respondeat superior."

Dr. Philips testified by deposition as follows:

Q: At this time, Doctor, if you would, would you go ahead and state for us your opinions? And we can list those, the opinions you have in this case based upon your review of these records and then we can kind of go back and take each one and look at the basis for those opinions, if you can do that for us.

MR. WAITE: Objection.

A: Well, my overall opinion is that all of the individuals caring for this infant ignored a collection of symptoms that should have been sufficient to trigger earlier and more aggressive intervention to diagnose and stabilize this infant and prevent what ultimately happened.

Q: Okay. Any other opinions?

MR. WAITE: Objection.

A: Well, it's my opinion that <u>failure to appropriately diagnose and treat this infant earlier caused the severe brain injury</u> that the child suffered and that is responsible for why the child is profoundly injured today.

                    *       *       *

Q: When you say all ignored the collection of symptoms, who are you referring to when you say "all"?

A: Those individuals who were caring for the infant, the nursing staff and Dr. Cunningham

                    *       *       *

8

Q: All right. Let's go back and see if we can now in terms of what you've seen in the chart that evidenced signs of respiratory distress and you've indicated when the records show each particular sign was charted which you consider to be clinically significant.

Let's take that information and get your opinion as to when these constellation or accumulation of signs were clinically significant enough to where you believe Dr. Cunningham should have intervened and then we can talk about the intervention after we do that.

A: Well, I believe that by four A.M on the morning following birth, which is about five and a half hours of age, the infant was being given blows of oxygen in order to relieve cyanosis and had had some signs of respiratory distress in addition to that and in addition had the elevated temperatures. By that time, by four A.M, something more than ordering a blood sugar should have been done.

Q: Now, is it correct to say that you believe that by four o'clock in the morning the record reflects that there were enough signs and symptoms of respiratory distress that Dr. Cunningham should have taken some action? Is that correct?

A: Yes.

*       *       *

Q: What treatment would you believe should have been instituted at that point?

A: The principal treatment probably would have been the administration of supplemental oxygen.

Q: Okay. How about fluids?

A: As well as the placement of an intravenous line and administration of intravenous antibiotics.

Q: Had that occurred at or about 5:30 A.M, do you have an opinion based upon reasonable medical probability that this infant would not have suffered permanent neurological injury?

9

A:    I think that is correct.

(All emphasis added).

The record reveals that although the staff nurses were allowed to administer blows of oxygen on an emergency basis, they were not authorized, absent a physician's order, to perform the "administration of supplemental oxygen" as Dr. Philips opined should have been done. Dr. Philips' testimony supports the defendant nurses' argument that it was Dr. Cunningham, and not the nursing staff, who was responsible for the diagnosis and treatment which Dr. Philips says should have occurred and that the negligence of the nurses or their deviation from the standard of care was not the cause of harm to Tyler. Dr. Philips further deposed as follows:

Q:    With regard to your opinion that there was a fail-
       ure to diagnose and treat Tyler Davis which caused
       the serious neurological injury, is it a correct
       statement that Dr. Cunningham was the medical
       person who was charged with the responsibility to
       diagnose any conditions and institute treatment?

MR. WAITE: Objection.

THE WITNESS: I want to hear that again, please.

(Requested portion of record read).

A:    He was the medical person, yes.

                    *       *       *

Q:    Can you set your own parameters as to how you would
       feel comfortable answering that question?

A:    Now, let me make sure I know what you're asking me.
       You're asking me can nurses render diagnoses and
       prescribe treatments.

10

Q: Right.

A: In newborn intensive care or in newborns.

Q: Right.

A: Some can, those with special training.

Q: Okay.

A: Most floor nurses, shift nurses are not.

Ms. Davis presented no evidence suggesting that any of the defendant nurses had "special training" or authorization to render diagnoses or prescribe treatments.

Significantly, the record shows that Dr. Cunningham was present and observing Tyler's medical situation at 3:55 AM. His only order to the nurses at that time was to "just watch infant closely." Dr. Cunningham testified that the nursing staff had informed him that they had administered blows of oxygen intermittently, and that he was notified every time Tyler was given oxygen. The following portions of Dr. Cunningham's deposition testimony are significant with regard to the communication between himself and the defendant nurses:

Q: And during this entire timeframe from the time of eleven o'clock—or can we actually start it, I guess, 10:55 when you first saw the child; based on this late entry in your testimony, had the nurses communicated in your opinion the information to you that was necessary for you to make a proper diagnosis of what was occurring with Tyler Davis?

A: Yes.

11

* * *

A:   I was kept acutely aware of the baby's condition--

Q:   Okay.

A:   --by the nurses.  The nurses were all very attentive and very concerned the whole time.

* * *

Q:   Okay.  Were you advised at 5:45 that the respirations of the child were that high?

A:   I don't know, but I was advised multiple times during that night that the respirations were changing up and down from time to time.

Q:   Okay.

A:   And the, quote, normal parameters of respirations vary between 65 and 30 and then 10 percent either above or beyond that is not really terribly exciting at that time.

Q:   All right.

A:   But I was aware of the condition of the baby almost minute by minute.

Dr. Cunningham's testimony that the nurses provided him with all the essential information he needed to make an appropriate diagnosis is undisputed.  Further, he testified that "I never left the hospital ... I was always immediately available."

From the foregoing testimony, and our review of the entire record in this case, we find that, taking into consideration all the evidence in the light most favorable to the plaintiff and drawing all reasonable inferences in her favor, we concur with the judgment of the trial court that the injuries sustained by Tyler

12

were proximately caused by Dr. Cunningham's deviation from the accepted standard of care and not by any negligence on the part of the defendant nurses. The plaintiff has failed to meet the burden placed upon her by T.C.A. § 29-26-115(a)(3).

Accordingly, the trial court's judgment is affirmed and the case remanded for such other and further action as may be necessary. Costs on appeal are taxed and assessed to the appellant.

_____
Don T. McMurray, Judge

_____
Houston M Goddard, Presiding Judge

_____
Herschel P. Franks, Judge

13

IN THE COURT OF APPEALS

| | |
|---|---|
| REBA V. DAVIS and TYLER WAYNE DAVIS by next friend, REBA V. DAVIS,<br><br>            Plaintiffs-Appellants<br><br><br><br><br>vs.<br><br><br><br><br><br>HARRIMAN CITY HOSPITAL, THE CITY OF HARRIMAN, JEAN ANGELO, BRENDA RUTHERFORD, BETTY SAMPSON, RHONDA MARTIN, MELINDA LATHAM, SHARON UNDERWOOD and VICKIE KLINNERT,<br><br>            Defendants-Appellees | ROANE CIRCUIT<br>C. A. NO. 03A01-9701-CV-00016<br><br><br><br><br><br><br><br>HON. RUSSELL E. SIMMONS, JR.<br>JUDGE<br><br><br><br><br><br><br>AFFIRMED AND REMANDED |

## JUDGMENT

This appeal came on to be heard upon the record from the Circuit Court of Roane County, briefs and argument of counsel. Upon consideration thereof, this Court is of the opinion that there was no reversible error in the trial court.

The trial court's judgment is affirmed and the case remanded for such other and further action as may be necessary. Costs on appeal are taxed and assessed to the appellant.

PER CURIAM