IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE

# GLENDA CLICK, as next of kin to CURTIS HUGH CLICK, deceased v. NELSON J. MANGIONE, ET AL.

**Direct Appeal from the Circuit Court for Davidson County**
**No. 97-C-267  Walter C. Kurtz, Judge**

**No. M1999-00129-COA-R3-CV- Decided July 7, 2000**

This is a medical malpractice case.  The plaintiff's husband died of a cardiac rupture while in the care of the defendant physicians.  The plaintiff filed a wrongful death suit, asserting medical malpractice in the care of her husband.  The trial court granted summary judgment to the defendant doctors, finding that the plaintiff's expert's testimony failed to show that a breach of the standard of care by the defendants caused the death of the plaintiff's husband.  The plaintiff appeals.  We affirm, finding that the plaintiff did not present evidence that, to a reasonable degree of medical certainty, a breach of the standard of care by the defendants caused the death of the decedent.

**Tenn. R. App. P. 3; Judgment of the trial court is affirmed**

HOLLY KIRBY LILLARD, J., delivered the opinion of the court, in which ALAN E. HIGHERS, J., and DAVID R. FARMER, J. joined.

Hugh P. Garner, Chattanooga, Tennessee, for the appellant, Glenda Click.

Michael A. Geracioti, Nashville, Tennessee, for the appellees, Nelson J. Mangione, Douglas A. Waldo, and Douglas A. Waldo, M.D., P.C.

## OPINION

This case arises out of the death of Curtis Hugh Click ("Click"), whose heart ruptured while undergoing a diagnostic test.  On February 2, 1996, forty-five-year-old Click, a maintenance worker, experienced chest pains while shoveling snow at his job at Emerald Hodgson Hospital in Sewanee, Tennessee.  Click sought treatment at the Southern Tennessee Medical Center in Winchester, Tennessee, where he was diagnosed with an "acute myocardial infarction" i.e., a heart attack.  The next day, Click was airlifted to Centennial Medical Center in Nashville, Tennessee, where he was admitted under the care of Defendant Nelson J. Mangione, M.D. ("Dr. Mangione"), a cardiologist employed by a professional association of cardiologists, Defendant Douglas A. Waldo, M.D., P.C. Defendant Douglas A. Waldo, M.D. ("Dr. Waldo") assisted Dr. Mangione in his treatment of Click. Over the next several days, they ordered a number of diagnostic tests for Click, including blood tests, echocardiograms and an arteriogram.

On February 6, 1996, Click underwent a pharmacological "stress test" known as a Persantine perfusion study. This test involves the injection of the drug Persantine[1] into the patient's bloodstream, followed by the injection of a radio isotope, allowing a technician to scan the flow of blood into the patient's heart. Persantine has the effect of increasing the coronary blood flow into the patient's heart. The Persantine test is used in order to obtain a better view of the blood flow to the heart of a patient who is unable to take the standard "treadmill" physical stress test.

Approximately one and one-half hours after the Persantine had been injected into his bloodstream, Click went into cardiac arrest and died, despite the efforts of medical personnel to resuscitate him.[2] The autopsy revealed that Click had suffered a rupture of the left posterolateral wall of the heart, and that the rupture was associated with the myocardial infarction he had experienced several days before.

On January 24, 1997, Click's widow, Plaintiff Glenda Click, filed a malpractice claim against Dr. Mangione, Dr. Waldo, and Douglas A. Waldo, M.D., P.C., the professional association to which Waldo and Mangione belonged. The Plaintiff alleged that the Defendants had breached the standard of care by ordering a Persantine perfusion test on her husband rather than performing heart bypass surgery or angioplasty. She contended that, had the Defendants performed surgery or angioplasty instead of ordering the Persantine stress test, her husband would not have died.

The Defendants filed a motion for summary judgment, supported by their affidavits stating that their care of Click complied with the recognized standard practices of cardiology in their community, and that no act or omission on their part caused or contributed to his death. The Plaintiff responded with the affidavit of Alabama cardiologist Ronald Hanson, M.D. ("Dr. Hanson"). Dr. Hanson stated that, in his opinion, the Defendants' actions in performing a stress test rather than angioplasty or bypass surgery fell below the applicable standard of care, and "precipitated" Click's death. The Defendants then withdrew their motion for summary judgment in order to take Dr. Hanson's deposition.

In his deposition, Dr. Hanson testified that the Persantine stress test was "medically unnecessary," and that the test had precipitated Click's death by increasing the stress on the left ventricular wall of his heart. Dr. Hanson stated that, in his opinion, the Defendants should have performed angioplasty or bypass surgery on Click rather than subjecting him to the Persantine stress test. He testified that angioplasty or bypass surgery would have increased the flow of blood to Click's heart, thereby decreasing the risk of cardiac rupture. However, Dr. Hanson also testified that angioplasty or bypass surgery would merely make cardiac rupture "less likely to occur"; neither

---

[1]Persantine is also known as "Dipyridamole," the name by which the Plaintiff's expert refers to the drug in his deposition.

[2]The Persantine Perfusion test is performed in two stages. During the first, the "resting stage," the technician intravenously administers the radio isotope into the patient's bloodstream, in order to scan the patient's heart "at rest." After the first scan is completed, the patient is administered Persantine, followed by a second injection of the radio isotope, allowing the technician to conduct a second scan of the patient's heart. Click's cardiac arrest occurred approximately one and one-half hours after administration of the Persantine, as the technician was preparing to start the second scan of his heart.

would prevent a cardiac rupture. Dr. Hanson noted that once a patient sustains a cardiac rupture, according to Dr. Hanson, "almost nothing"can be done to save his life. Although Dr. Hanson opined that Click's cardiac arrest was precipitated by the Persantine stress test, he acknowledged that the package insert that came with the drug contained no report of any linkage between use of the drug and the risk of cardiac rupture, and that he had not seen a single reported case in which the use of a Persantine perfusion test had been associated with cardiac rupture. Therefore, he could not testify within a reasonable degree of medical certainty that use of the drug caused Click's cardiac rupture, although he insisted that "it's still within the realm of possibility."

The Defendants then filed a supplemental motion for summary judgment. In support of the motion, the Defendants filed the deposition of Dr. Hanson, the Defendants' depositions and affidavits, the affidavit of the pathologist who conducted the autopsy of Click's heart, and the affidavit of the medical technician who performed the Persantine perfusion scan. In the motion, the Defendants argued that they were entitled to summary judgment based on the Plaintiff's failure to present expert medical testimony stating, to a reasonable degree of medical certainty, that the Defendants had breached the standard of care in their treatment of Click, or that their treatment of Click caused his death.

The trial court granted the Defendants' motion for summary judgment. The trial court found that the testimony of the Plaintiff's expert failed to show that the Defendants breached the standard of care by ordering the Persantine perfusion study for Click, or that the Persantine test caused Click's death. The trial court's order stated:

> On the entire record the Court is of the opinion that the plaintiff has presented no evidence to indicate that any breach of the standard of care by the defendant doctors caused the death of Mr. Click. The affirmative evidence before the Court is that the cardiac rupture would have happened and that the stress test did not cause the cardiac rupture.

From this order, the Plaintiff now appeals.

On appeal, the Plaintiff argues that Dr. Hanson's testimony is sufficient to raise a genuine issue of material fact as to whether the Defendants breached the standard of care and caused the death of her husband. The Plaintiff contends that whether the Persantine stress test caused her husband's heart to rupture, or whether angioplasty or bypass surgery could have prevented the rupture, are questions of fact to be resolved by the jury.

Summary judgment is proper only when the party moving for summary judgment is able to show that there are no genuine issues of material fact, and that it is entitled to judgment as a matter of law. Tenn. R. Civ. P. 56.03. The party moving for summary judgment bears the burden of demonstrating that no genuine issue of material fact exists. *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997). Once that party has filed a properly supported motion for summary judgment, however, demonstrating that there are no genuine issues of material fact, "the burden of production of evidence shifts to the non-moving party to produce evidence which would establish a genuine factual dispute." *Masters v. Rishton*, 863 S.W.2d 702, 705 (Tenn. Ct. App. 1992). If the non-moving party is unable to offer evidence to establish the essential elements of his claim, then summary judgment is appropriate. *Blair v. Allied Maintenance Corp.*, 756 S.W.2d 267, 269-70 (Tenn. Ct. App. 1988). Since the trial court's grant of the Defendants' motion for summary

judgment involves only questions of law, no presumption of correctness attaches to the trial court's decision. ***Bain***, 936 S.W.2d at 622. Therefore, our review of the trial court's grant of summary judgment is *de novo* on the record before this Court. ***Warren v. Estate of Kirk***, 954 S.W.2d 722, 723 (Tenn. 1997).

Claims for medical malpractice are governed by Tennessee Code Annotated Section 29-26-115. ***Moon v. St. Thomas Hosp.***, 983 S.W.2d 225, 229 (Tenn. 1998); ***Kilpatrick v. Bryant***, 868 S.W.2d 594, 597 (Tenn. 1993). This statute provides that a plaintiff asserting a claim for medical malpractice has the burden of proving, by expert testimony, the standard of care, a breach of the standard of care by the defendant, and that the defendant's breach of the standard of care caused the plaintiff's injury:

> **29-26-115.     Claimant's burden in malpractice action –Expert testimony–Presumption of negligence–Jury instructions.**–(a) In a malpractice action, the claimant shall have the burden of proving by evidence as provided by subsection (b):
>
>   (1) The recognized standard of acceptable professional practice in the profession and the speciality thereof, if any, that the defendant practices in the community in which he practices or in a similar community at the time the alleged injury or wrongful action occurred;
>
>   (2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and
>
>   (3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

Tenn. Code Ann. § 29-26-115 (1980).

To withstand a motion for summary judgment, the plaintiff in a malpractice claim must present competent medical testimony, to a reasonable degree of medical certainty, which raises a genuine issue of material fact as to each element of the plaintiff's claim. ***White v. Methodist Hosp. South***, 844 S.W.2d 642, 648 (Tenn. Ct. App. 1992). In order for the Plaintiff to survive the Defendants' motion for summary judgment, she had to establish, through expert testimony, that a genuine issue of fact existed as to whether the Defendants breached the recognized standard of care in the community, and whether that breach of care caused her husband's death. ***Howse v. State***, 994 S.W.2d 139, 141 (Tenn. Ct. App. 1999); ***Russell v. Pakkala***, No. 02A01-9703-CV-00053, 1998 WL 10212, at * 2 (Tenn. Ct. App. Jan. 14, 1998); ***White***, 844 S.W.2d at 648.

In this case, the Plaintiff's medical expert was unable to testify to a reasonable degree of medical certainty as to the Defendants' deviation from the standard of care. Dr. Hanson's affidavit stated that it was his belief that the Defendants "fell below the standard of care" in their treatment of Click, and that "performing a stress test on a patient who is four to five days post a major myocardial infarction would approach negligence per se." In his deposition, however, Dr. Hanson admitted that the standard of care for patients who have undergone recent myocardial infarctions includes pharmacological stress tests, and that he could not say that it would be a deviation from the standard of care to order a Persantine perfusion test to be performed within four days after a patient had suffered a myocardial infarction:

Q. All right. My question was: Is it a deviation from the standard of care to perform pharmacologic stress testing four or five days after a myocardial infarction?

A. I would say that that is a borderline area which you would have differences of opinions. I cannot say with absolute certainty that it is below the standard of care.

Dr. Hanson stated that he would not have performed a Persantine perfusion study on Click, had Click been his patient. The fact that Dr. Hanson would have undertaken a different course of treatment is not sufficient to establish that the Defendants breached the standard of care in their treatment of Click. *Roddy v. Volunteer Medical Clinic, Inc.*, 926 S.W.2d 572, 578 (Tenn. Ct. App. 1996); *Lewis v. Hill*, 770 S.W.2d 751, 754 (Tenn. Ct. App. 1988). Indeed, Dr. Hanson acknowledged that the mortality rate for Persantine perfusion tests, at .05%, is roughly half the mortality rate for angioplasty or bypass surgery, and that there is a school of thought among cardiologists that acute myocardial infarctions and coronary artery disease should be treated conservatively, without angioplasty, unless the patient has first failed a diagnostic stress test. It is not a departure from the standard of care for a physician to choose one of several different medically accepted courses of treatment for his patient. *Harris v. Buckspan*, 984 S.W.2d 944, 952-53 (Tenn. Ct. App. 1998).

Moreover, even if ordering the Persantine perfusion test were a deviation from the standard of care, Dr. Hanson could not testify to a reasonable degree of medical certainty that the test caused Click's cardiac rupture. At most he said there *could* have been a cause and effect relationship between the drug and Click's cardiac rupture, that it was "within the realm of possibility." In a medical malpractice action, the mere possibility of causation is not sufficient to establish the plaintiff's claim; the plaintiff's expert must testify that the defendant's alleged breach of the standard of care, to a reasonable degree of medical certainty, caused the plaintiff's injury:

> [P]roof of causation equating to a "possibility," a "might have," "may have," "could have," is not sufficient, as a matter of law, to establish the required nexus between the plaintiff's injury and the defendant's tortious conduct by a preponderance of the evidence in a medical malpractice case. Causation in fact is a matter of probability, not possibility, and in a medical malpractice case, such must be shown to a reasonable degree of medical certainty.

*Kilpatrick v. Bryant*, 868 S.W.2d 594, 602 (Tenn. 1993) (citing *White v. Methodist Hosp. South*, 844 S.W.2d 642, 648-49 (Tenn. Ct. App. 1992)).

The certified nuclear medical technician who conducted the Persantine perfusion study on Click, Michael Albritton, stated in his affidavit that Click's cardiac rupture occurred more than an hour after the administration of Persantine. Dr. Hanson was questioned on the likelihood that a cardiac rupture which occurred more than an hour after the administration of the drug could have been causally related to the drug:

Q. When did Mr. Click suffer the complication that you associate with the perfusion scan?

A. The record does not say.

Q. Assume that it occurred more than one hour after he received Dipyridamole. Do you still associate his complication to the perfusion scan or the use of the drug Dipyridamole?

A. The effect of dipyridamole is relatively short lived.

If you administer Dipyridamole, the patient had adverse symptoms, you administered Aminophylline, I think it would be reasonable to assume under this hypothetical case that one hour later, probably the effect of the Dipyridamole was gone.

If you administered IV Dipyridamole, the patient had symptoms and you did not reverse it with IV Aminophylline, then it's possible that it might have an effect as much as one hour later. But I believe the duration of Dipyridamole is generally considered to be less than one hour.

Q. So in this instance–and this is a hypothetical question–if this gentleman received the Dipyridamole, reported chest pain, and then received Aminophylline which reverse [sic] the effects and relieve the chest pain, then from that point forward, more than an hour elapsed before the cardiac rupture or other cardiac event occurred, is it your opinion that the Dipyridamole was not the cause of the cardiac rupture or subsequent cardiac event?

A. In that theoretical scenario of cardiac arrest occurring more than an hour after the administration of Dipyridamole, I would say there would be some serious question as to whether or not the cause, effect between the rupture and the administration of the medication.

Q. Would you agree that you could not relate the Dipyridamole or the testing to the cardiac event within a reasonable degree of medical certainty under the fact scenario that I've presented to you in my hypothetical question?

A. In a hypothetical question, if it's more than an hour, generally speaking, I would suspect it would become less and less likely to be causually related.

Q. Does that mean that you could not state causation to a reasonable degree of medical certainty under the hypothetical facts that I've asked you to consider?

A. I did not specifically research that particular question, but I would say that it would be difficult to say with absolute medical certainty that there was a cause and effect relationship more than one hour after the administration of the Dipyridamole.

Q. Would it be fair to state that it is more likely than not that the Dipyridamole did not have a causative effect on the hypothetical question that I asked you?

A. I cannot say it's more likely than not or less likely than not.

-6-

Q. Can't say one way or the other, can you?

A. No, I don't think I can.

Dr. Hanson was also unable to testify to a reasonable degree of medical certainty that bypass surgery or angioplasty would have prevented Click's cardiac rupture:

Q. Would angioplasty prevent cardiac rupture?

A. It would reduce the chances, but it would not prevent it.

Q. Will bypass, cardiac bypass surgery, prevent cardiac rupture?

A. By increasing the blood flow to the affected area, it's less likely to rupture, but it will not prevent it.

In sum, Dr. Hanson's testimony on causation indicated his belief of the possibility that the Persantine perfusion test caused Click's cardiac rupture, and that Click would have been "less likely" to have experienced a cardiac rupture had the Defendants performed angioplasty or bypass surgery. These statements are insufficient to establish causation for the Plaintiff's medical malpractice claim.

Consequently, we find that the Plaintiff failed to present competent medical testimony sufficient to create a genuine issue of material fact in her malpractice claim against the Defendants. Therefore, the trial court's grant of the Defendants' motion for summary judgment is affirmed.

The decision of the trial court is affirmed. Costs on appeal are taxed to the Appellant, Glenda Click, for which execution may issue, if necessary.

**HOLLY KIRBY LILLARD, J.**

**ALAN E. HIGHERS, J.**

**DAVID R. FARMER, J.**

-7-