IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
August 17, 2007 Session

# EVA HENDRIX, ET AL. v. LIFE CARE CENTERS OF AMERICA, INC., ET AL.

**Appeal from the Circuit Court for Hamilton County**
**No. 04 C 1795     W. Neil Thomas, III, Judge**

---

**No. E2006-02288-COA-R3-CV - FILED DECEMBER 21, 2007**

---

In this wrongful death case, Eva Hendrix ("Daughter"), acting individually and as administratrix of the estate of her mother, the decedent Edith Beck ("Mother"), sued Life Center Centers of America, Inc. ("Nursing Home") among others. Nursing Home filed a "Motion to Compel Arbitration" based upon an arbitration clause signed by Daughter when Mother was admitted to Nursing Home's facility approximately four months before her death. Daughter responds that she was not actually authorized to act as Mother's attorney-in-fact at that time because Mother was still able to make her own medical decisions and therefore the power of attorney never became effective. The trial court agreed. Nursing Home appeals, arguing that Daughter's power of attorney was effective when she signed the arbitration clause, and that, in any event, an actual or apparent agency relationship existed between Mother and Daughter, and Mother and Daughter "treated the [power of attorney] document as though it was effective." We find that the evidence does not preponderate against the trial court's conclusion that the power of attorney was not in effect when Daughter signed the various documents handed to her by Nursing Home. We further hold that Nursing Home's alternative theories must fail as a matter of law. We therefore affirm.

**Tenn R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which D. MICHAEL SWINEY and SHARON G. LEE, JJ., joined.

Kyle E. Hedrick and Glenna M. Ramer, Chattanooga, Tennessee, for the appellants, Life Care Centers of America, Inc., Life Care Center of East Ridge, and East Ridge Medical Investors, LLC.

James W. Clements, III, Chattanooga, Tennessee, for the appellee, Eva Hendrix, Individually and as Administratrix of the Estate of Edith C. Beck.

**OPINION**

I.

Mother executed two separate Power of Attorney ("POA") documents, one in 2002 and one in 2003. At the outset, we will defer discussion of these documents, the circumstances under which they were to become effective, and the crucial question of which POA controls this case. At this juncture, we note simply that both documents named Daughter as Mother's attorney-in-fact, contingent upon the occurrence of certain circumstances pertaining to Mother's health that would trigger Daughter's authority.

Mother was admitted to Nursing Home in May 2004 after hip replacement surgery. A report on her transfer from the hospital where the surgery occurred indicated that Mother was "alert and oriented" and "understands instructions and can assist in her own care." Nevertheless, Daughter handled most of the paperwork when Mother arrived at Nursing Home. Daughter signed several forms on Mother's behalf, including the arbitration agreement that is the crux of this dispute. From the evidence in the record, it does not appear that anyone – Mother, Daughter, or the Nursing Home employee, Elisa Cessor, who handled the admission process – was particularly concerned at the time about Daughter's legal status with respect to the signing of the forms. Indeed, Nursing Home's attorney conceded at oral argument,

> I think the record's clear that Ms. Cessor [*i.e.*, the admitting employee of Nursing Home] did not take the written Power of Attorney [document] and review it, and then attempt to contact a doctor and request a record that says, "[Mother] has been found medically unable to handle these circumstances."

Rather, Nursing Home, in its words, "rel[ied] upon someone" – namely Daughter – "who comes in and says, 'I'm the POA. I have the authority. Here's the Power of Attorney. Let me sign the documents.'"

On the same day that Daughter signed several admissions forms for Mother, including the arbitration form, Mother herself signed a "Do Not Resuscitate" form, or "DNR." Nursing Home employee Cessor stated that Mother did this voluntarily and with apparent understanding of what she was doing. Nursing Home's attorney conceded this point at oral argument, stating, "I don't think there was any question raised by [Nursing Home] at the time she signed the DNR that she had the ability to sign the DNR."

Mother died in October 2004. Daughter filed suit in November 2004 seeking damages for Mother's wrongful death. She sued individually and as administratrix of Mother's estate. In March 2005, Nursing Home filed a motion to enforce arbitration and stay proceedings, relying upon the arbitration agreement signed by Daughter on behalf of Mother. The court denied the motion in November 2005, declaring,

> [t]here is no evidence before the Court that the decedent was incapacitated at the time of her admission to Life Care. As a matter of fact, the contrary is indicated by Life Care's obtaining the decedent's signatures on do not resuscitate orders. Accordingly, based upon the record before the Court, there has been no showing that the power of attorney became active.

Nursing Home appeals as a matter of right. *See* Tenn. Code Ann. § 29-5-319 (Supp. 2000).

Our review is *de novo* upon the record of the proceedings below, but that record comes to us with a presumption of correctness as to the trial judge's factual findings. Tenn. R. App. P. 13(d). We must honor this presumption unless we find that the evidence preponderates against those findings. ***Id.***; ***Hass v. Knighton***, 676 S.W.2d 554, 555 (Tenn. 1984). There is, however, no presumption of correctness with regard to the trial court's conclusions on matters of law, ***Taylor v. Fezell***, 158 S.W.3d 352, 357 (Tenn. 2005), or to its application of law to the facts, ***State v. Thacker***, 164 S.W.3d 208, 248 (Tenn. 2005), or to "conclusions that are based on undisputed facts," ***Hall v. Houston***, No. M2002-01371-COA-R3-CV, 2003 WL 21688578, at *3 (Tenn. Ct. App. M.S., filed July 21, 2003). The interpretation of a written instrument, including a power of attorney or an arbitration agreement, is a matter of law. ***Tenn. Farmers Life Reassurance Co. v. Rose***, No. E2005-00006-SC-R11-CV, 2007 WL 2826918, at *4 (Tenn., filed October 2, 2007) (power of attorney); ***Fontaine v. Weekly Homes, L.P.***, No. M2002-01651-COA-R3-CV, 2003 WL 21946721, at *1 (Tenn. Ct. App. M.S., filed August 13, 2003) (arbitration agreement). Thus, no presumption of correctness attaches to the trial court's interpretation of the written terms of the documents in question. However, the trial court is entitled to a presumption of correctness as to its findings with respect to the surrounding factual circumstances.

II.

As an initial matter, we must decide which Power of Attorney document controls this case. Mother executed two separate POAs: a Tennessee Healthcare Durable Power of Attorney and a broader Durable Power of Attorney. The healthcare POA was executed in August 2002; the general POA was executed in June 2003. Both documents name Daughter as Mother's attorney-in-fact, but the circumstances under which Daughter's authority becomes effective are different under language found in the two documents.

The healthcare POA contains the following provision relating to when it becomes effective:

> This healthcare durable power of attorney only becomes effective when I can't make my own medical decisions. My agent [*i.e.*, the attorney-in-fact] and my attending physician will decide when I can't make decisions for myself.

It also states, "[n]otwithstanding this document, you [*i.e.*, Mother] have the right to make medical and other healthcare decisions for yourself so long as you can give informed consent with respect to the particular decision."

The general POA includes the following language concerning its effectiveness:

THIS POWER OF ATTORNEY SHALL BECOME EFFECTIVE
UPON INCAPACITY OF THE PRINCIPAL

\*   \*   \*

2. Effective Date and Termination

A. Effective: This power of attorney shall become effective immediately upon my incapacity or inability to manage my own affairs.

B. Termination: This power of attorney shall remain in full force and effect until it is revoked.

   i. By written revocation
   ii. By written notice recorded in the same office as this instrument in the event this instrument is recorded.
   iii. Until terminated by operation of law.

It is my intent that this power of attorney shall remain effective even in the event of mental or physical disability on my part whether continuous or intermittent.

(Capitalization and formatting in original.)

As can be seen, whereas the healthcare POA becomes effective only when Mother "can't make [her] own medical decisions," a phrase addressing *mental* capacity, the general POA becomes effective "immediately upon [her] incapacity *or* inability to manage [her] own affairs" (emphasis added). In light of the subsequent language in the general POA pertaining to "mental or physical disability," it can be argued, and Nursing Home does indeed argue, that "incapacity" in this context refers to *either* mental *or* physical incapacity.[1] We do not so hold, but assuming for the sake of argument that Nursing Home is correct, this would be important because Daughter's attorney

---

[1] The analysis on this point is complicated by the language that appears in the general POA's "Medical Care" section. On the one hand, the attorney-in-fact's authority over Mother's admission to a nursing home is specifically made contingent upon a "licensed physician" declaring Mother "incompetent or incapable of acting for myself" – a standard that seems to address mental capacity. On the other hand, the very next sentence states that the attorney-in-fact's powers over "*all matters* pertaining to . . . my person" are to "continue completely after I have become *physically or mentally* incapacitated" (emphases added). As will be seen, we are spared the necessity of sorting through this linguistic thicket in greater detail, as our holding pertermits the issue.

conceded at oral argument that Mother was *physically* incapacitated at the time of her admission to Nursing Home. If the general POA, as interpreted by Nursing Home, controls, it would follow that Daughter's POA powers were active at the time of Mother's admission, and therefore the arbitration clause would be valid. However, the general POA also contains this important language, in the section on medical care:

> In the event I have executed a valid Durable Power of Attorney for Health Care and in the event there is any conflict between the two documents, *it is my intention that the Durable Power of Attorney for Health Care shall be controlling.*

(Emphasis added).

At oral argument, Nursing Home's attorney argued that there can be no "conflict" between an active POA and an inactive POA, and thus, if we accept Daughter's argument that the healthcare POA was ineffective at the time in question, it would follow necessarily that the general POA, which (it is argued) became effective upon Mother's *physical* incapacitation, must control. We cannot accept this line of reasoning. The general POA states that the healthcare POA controls "[i]n the event I have *executed* a *valid* [healthcare POA]" (emphases added). If we were to accept Nursing Home's logic, we would essentially be rewriting that clause and declaring, in effect, that the healthcare POA takes precedence *only upon becoming effective*, contrary to the expressed intent of the parties that it take precedence upon being validly executed. This would mean that, in any case with similar language where the general POA has a broader definition of incapacity than the healthcare POA, the general POA's more permissive standards for effectiveness would take precedence over the healthcare POA's more stringent standards. We think, based on the text of the document in question, that this is clearly not what is intended by the phrase "[i]n the event I have executed a valid Durable Power of Attorney for Health Care and in the event there is *any conflict* between the two documents" (emphasis added). Where the matter at issue relates to health care,[2] and there is a conflict between the general POA and the healthcare POA over the question of whether the attorney-in-fact had POA authority at the time in question, the healthcare POA, by the general POA's own terms, controls.

III.

Having determined that the healthcare POA controls, the next question is whether the trial court erred in ruling that "[t]here is no evidence before the Court that the decedent was incapacitated

---

[2] We do note that the healthcare POA does not contain any language specifically pertaining to arbitration agreements, whereas the general POA gives Daughter the the power "[t]o sue, defend or compromise all legal actions involving me or my estate" and "the power to generally do, sign or perform any other act, deed, matter or thing whatsoever that ought to be done, signed or performed[.]" However, Nursing Home does not argue, either in its briefs or at oral argument, that the arbitration agreement lies outside the scope of healthcare-related decision-making. Moreover, the Supreme Court recently held that "an attorney-in-fact acting pursuant to a durable power of attorney for health care may sign a nursing-home contract that contains an arbitration provision . . . ." ***Owens v. Nat'l Health Corp.***, No. M2005-01272-SC-R11-CV, 2007 WL 3284669, at *6 (Tenn., filed November 8, 2007).

at the time of her admission to Life Care" and therefore "there has been no showing that the power of attorney became active."

We note that the word "incapacitated" appears only in the general POA, not in the healthcare POA. The healthcare POA declares simply that it "becomes effective when I can't make my own medical decisions." However, we believe the context of the trial court's opinion, particularly the reference to Mother signing the Do Not Resuscitate order, makes clear that the court was referring to the concept of *mental* incapacity (as opposed to physical incapacity), which is directly on point with the healthcare POA's requirement that Mother be unable to "make [her] own medical decisions" and its further statement that "medical and other healthcare decisions" remain her prerogative "so long as [she] can give informed consent with respect to the particular decision." We interpret the court's order as declaring, as a factual matter, that Mother was not *mentally* incapacitated, and thus was able to make her own medical decisions and give informed consent with respect to medical and other healthcare decisions.

Nursing Home argues that Mother was incapacitated when Daughter signed the arbitration agreement, and therefore the POA was effective at that time and the agreement is valid. To the extent that this argument is premised on the notion that *physical* incapacity is enough to trigger Daughter's POA powers, we simply refer back to our above-stated holding that the healthcare POA, which requires *mental* incapacity, takes precedence over the general POA, which arguably requires only physical incapacity. On the other hand, to the extent that Nursing Home is suggesting that Mother was in fact mentally incapable of making decisions for herself at the time of admission, this is a factual argument, and it is our duty to determine whether the evidence preponderates against the trial court's factual findings on this issue.

In support of its argument, Nursing Home cites Daughter's testimony at her deposition that "there was a period of time that [Mother] was incapacitated and [Daughter] took care of her needs during that time," and other similar evidence suggesting that Mother was incapacitated. However, as noted earlier, there was countervailing evidence, which Nursing Home's brief does not mention, such as the medical report declaring Mother able to "understand [i]nstructions and . . . assist in her own care" and the fact that Mother voluntarily signed a Do Not Resuscitate order. All of this evidence, and more, was before the trial court when it found as a matter of fact that Mother was not incapacitated such as to trigger the healthcare POA. Having reviewed the record, we cannot say that the evidence preponderates against the court's factual findings on this matter.

Because Mother was not incapacitated to the point of being unable to make her own decisions, it is clear that Daughter's POA authority, by the terms of the document creating it, was not effective at the time she signed the arbitration clause. It is not dispositive that the purported attorney-in-fact who invalidly signed the arbitration agreement is the same person as the plaintiff in this case. The arbitration clause purported to relinquish *Mother's* rights, not Daughter's, and it is not valid – it never was valid – unless its execution was validly authorized by Mother. This remains true regardless of Daughter's role in subsequent litigation.

IV.

Nursing Home advances several alternative theories for why the arbitration clause should be honored even if Daughter's power of attorney was ineffective. We find none of them persuasive.

First of all, we note that Nursing Home cannot prevail on an apparent agency theory. Nursing Home's brief contains considerable discussion of Daughter's beliefs, understandings and representations, but these alone cannot create apparent agency because they relate to acts and statements of the purported agent, not the purported principal (in this case, Mother). "Apparent agency is essentially agency by estoppel; its creation and existence depend upon such *conduct by the apparent principal* as will preclude him from denying another's agency." *White v. Methodist Hosp. S.*, 844 S.W.2d 642, 646 (Tenn. Ct. App. 1992) (emphasis added). Nursing Home simply does not make out a case that it relied on any conduct or representations by *Mother* that Daughter was her agent for the purpose in question.

This limitation would not matter, of course, if Nursing Home could show that Daughter actually *was* Mother's agent for the purpose in question, and thus had *actual* authority to sign the arbitration agreement. *See Necessary v. Life Care Ctrs. of Am., Inc.*, E2006-00453-COA-R3-CV, 2007 WL 3446636 (Tenn. Ct. App. E.S., filed November 16, 2007). This is precisely what Nursing Home attempts to do when it argues that Mother gave Daughter "express authority to handle the admissions process," and that this authority was valid regardless of the status of the POA document. However, the evidence offered by Nursing Home in support of this argument is inextricably intertwined with the power-of-attorney issue. Nursing Home's brief quotes from Daughter's deposition as follows:

> Q. So was it your understanding at that time that *once that [power of attorney] document was signed* you had the ability to sign the checks and do other things for your parents'[3] needs?
>
> A. As designated by them, yes. If they asked me to, yes.
>
> Q. Okay. Your understanding was that *once this was signed* on June the 2nd, 2003, if they asked you to do something for them, you had the power to do it *by this document*?
>
> A. That's correct.

(Emphasis and footnote added.) As can be seen, both questions and answers relate specifically to the powers purportedly vested by the power-of-attorney document, not to a separate agency relationship that can be analyzed independently of that document. Daughter's testimony establishes only that she believed she had the authority to act on Mother's behalf *because of the POA document* – the very document that we have already found to be ineffective for purposes of this case. Daughter's "understanding" of the POA does not alter its legal effect, and her erroneous beliefs

---

[3] Daughter was the attorney-in-fact for both her mother and father.

about the scope of her attorney-in-fact powers certainly cannot create an independent agency relationship, separate and apart from the very document she was testifying about.

At oral argument, Nursing Home emphasized Daughter's belief that she had authority to act on her parents' behalf only "[a]s designated by them" and "[i]f they asked me to." This statement, Nursing Home argues, is evidence that Daughter was acting with Mother's "express authorization" when she signed the admission documents, including the arbitration agreement. As best as we can understand it, the argument goes like this: Daughter told Nursing Home employees that she was acting on the basis of her POA authority when she signed the admission documents, and she testified that she believed her POA authority was only active when she was expressly authorized to exercise it for a certain purpose, so it therefore follows that, assuming she was being honest with Nursing Home, she *must* have been expressly authorized to sign the admission documents. This is an interesting thought experiment, but it is not evidence of agency. Whatever Daughter might have *believed*, nothing in the record convinces us that she actually *was* expressly authorized to sign these documents. There is evidence that Mother and Daughter discussed the Do Not Resuscitate order, but not that they discussed the other documents, including the arbitration agreement. Indeed, when asked at oral argument whether Daughter testified specifically that her Mother had told her to sign the documents in question, Nursing Home's attorney replied, "No. That's not in the record. There's no specific question asking that; she doesn't say that." We find no merit in the Defendants' position.

Nursing Home's final theory is that Mother and Daughter "treated the [power of attorney] document as though it was effective," and Nursing Home had a right to rely on their conduct. This argument is, at least in part, a rehash of the apparent and/or actual agency theories that we have already rejected. However, to the extent that it represents a new theory, it relies largely on ***Smith v. Smith***, 102 S.W.3d 648 (Tenn. Ct. App. 2002), which concerned a dispute between a mother's two sons over whether one of the sons exercised undue influence over her financial affairs before her death. In the course of finding that a confidential relationship did indeed exist between the mother and the son accused of undue influence, the court in ***Smith*** stated that "[a]lthough the power of attorney that Ethel granted to Jerry never became effective, under its terms, because Ethel never was certified by her physician as disabled or incapacitated, Ethel and Jerry acted as though the power of attorney was in effect and treated it as fully operative." ***Id.*** at 653. Nursing Home asks us to make a similar finding here – *i.e.*, that Mother and Daughter "acted as though the power of attorney was in effect and treated it as fully operative" – and rule in Nursing Home's favor on that basis. However, as noted in the agency discussion above, Nursing Home has not demonstrated that Mother "treated the document as though it was effective." The evidence might suggest that Daughter did so, but it is Mother's rights that are at issue. Moreover, the context of the finding in ***Smith*** is entirely different from the context of the instant case. The court in ***Smith*** did not revive an otherwise ineffective power-of-attorney agreement for purposes of giving legal force to the purported attorney-in-fact's actions, as Nursing Home is asking us to do. ***Smith*** simply held that, for purposes of defining the nature of the relationship between mother and son, their mutual choice to act "as though the power of attorney was in effect" should be taken into account. That is a far cry from suggesting that a document signed by Daughter should bind Mother as to a third party even though Daughter was *not* Mother's attorney-in-fact at the time she signed the document.

A second case cited by Nursing Home, ***Childress v. Currie***, 74 S.W.3d 324 (Tenn. 2002), also involves defining the nature of the relationship between the parties to the power-of-attorney agreement, not defining the effectiveness of that agreement *vis a vis* third parties. Nursing Home contends that ***Smith*** and ***Childress*** both stand for the proposition that "the critical element [is] the understanding of the party at interest" – meaning, we take it, the purported attorney-in-fact. That might make sense on the facts of ***Smith*** and ***Childress,*** but in the instant case, the party whose "interest" we must concern ourselves with is Mother, not Daughter. Nursing Home is not entitled, as it suggested on oral argument, to simply "rely upon someone who comes in and says, 'I'm the POA. I have the authority. Here's the Power of Attorney. Let me sign the documents.'" By signing the arbitration agreement, Daughter sought to bind Mother to a course of action that altered her legal rights. Unless Mother's power-of-attorney documents were in effect at the time – and we have already affirmed the trial court's ruling that they were not – Daughter did not have the power to do this. That her retrospective powerlessness now accrues to her own benefit is an odd quirk of this case's facts, and is undoubtedly frustrating to Nursing Home, but it does not alter the pertinent legal doctrines nor the proper outcome of this case. The arbitration agreement was not validly agreed to by Mother, and therefore it cannot bind her or her estate.

V.

For all of the foregoing reasons, we affirm the trial court's ruling. Costs on appeal are taxed to the appellant, Life Care Centers of America, Inc. Case remanded to the trial court for further proceedings.

_____
CHARLES D. SUSANO, JR., JUDGE